IN THE MATTER OF BERENICE S. SCARRITT, *an Infant.**

1.  **Father's right to Custody of his Minor Child—Child's welfare the first consideration.** In a contest for the possession of the person of a minor child, the welfare of the child is always the controlling consideration with the courts. In the contest is by a father seeking to regain his child, as he is its natural guardian and as such entitled to the custody of its person, it will be awarded to him, unless he is shown to be, for some reason, unfit or incompetent to take charge of the child, or unless the welfare of the child, for some special or extraordinary reason, demands a different disposition.

2.  ———: CONTRACT OF FATHER TO SURRENDER CUSTODY OF CHILD. By the common law, a father cannot irrevocably divest himself of his right and duty to have the custody and charge of his child. They spring from the law of nature; and public policy, for the good of society, will not permit him to abandon them.

3.  ———: CASE ADJUDGED. In the present case, a father sought to re-gain the custody of his child, a girl between six and seven years of age, from her maternal grand-parents. He had himself upon the death of his wife, the child's mother, at the solicitation of its grand-parents, placed the child (then a baby) in their care, to remain, as he expressed it in a letter, "until, at least, she passes her first de-cade in life." Some years afterward, he married again. established a home, and was desirous of taking the child to live with him; but the grand-parents declined to give her up. The court, upon consid-eration of all the circumstances, *Held*, that there was nothing in them which authorized a departure from the general rule, which gives the custody of the child to its father; that, indeed, the welfare of the child would be better promoted by giving her to her father than by leaving her with her grand-parents; and *as to* the letter (which the latter claimed amounted to a contract), that it was writ-ten under such circumstances that it ought not to be so considered, even if, as a contract, it would be held binding. For these reasons the child was ordered to be delivered into the custody of the father.

    *Contra.* It was established by the evidence that the welfare of the child did not require a change of custody; and as it was clearly shown that the attachment between the grand-parents and the child was as intense as that which exists between parent and child and the father by his conduct and agreement had encouraged and developed this attachment, he ought not to be permitted to sunder the relations between them. The interest and welfare of the child is certainly the paramount consideration, but the interests, feelings and welfare of the person to whom the child has been confided,

*Decided June 16th, 1882.

In the Matter of Berenice S Scarritt.

should not be ~~~~ disregarded. The court ought to consider the strength of the ~~~~ have been formed between the child and its grand-pare~~~~ Per HENRY, J., dissenting.

*Habeas Corpus.*

WRIT GRANTED.

*O. H. Dean, Wm. Warner, D B. Holmes, John C. Gage, John L. Peak* and *Jas. R. Riggins* for petitioner.

The testimony proves beyond cavil the following facts:

1st, That the little girl, Berenice, has a great affection for and is very much attached to the petitioner, her father, and his wife.

2nd, That Berenice's father, the petitioner, and his wife, are devotedly attached to this little child; and are very much grieved and pained because of the circumstances which deprive them of her society and affection; and that they are willing, desirous and exceedingly anxious to have the little girl in their own custody, and to care for her, train her, educate her, build her up in her moral and religious character, and lavish upon her all the deep affection and love of a father's and mother's heart; to make her own life bright and beautiful, a comfort to themselves, a source of happiness to others, and an ornament to society.

3rd, That the best interests, both present and future, of the little girl, will be subserved by removing her now to the custody of her father; because: (*a*) He has a happy, pleasant, healthy, comfortable home to offer her. (*b*) The moral, social and religious influences of that home are of the very best. (*c*) Her father is a lawyer of high standing and ability, prosperous in his profession, successful in all business matters, having obtained even this early in life, by his own individual exertions, almost a competency, and is enabled to do for his daughter anything necessary for her comfort or pleasure. (*d*) The father of Berenice is not only able to do for her now, everything that could be desired, but his prospects for the future are of the brightest,

and, if there is anything in indications, the future of Berenice, if under his care, would grow brighter and happier as the years roll on. (*e*) The attachment and tender affection of the father for his child, manifested through her whole life, is sufficient guaranty of his continued devotion to her interests and welfare.

4th, That while there is every reason that the father should have the custody of his daughter, and while the proof is ample that the welfare of the child will be bettered by placing her under his charge, there is also proof to the effect that the best interests of the child will not be subserved by leaving her in the custody of the respondents; because: (*a*) The grandmother is over-indulgent to the child, and the lack of training has a tendency to spoil her disposition. (*b*) Both of the respondents are now advanced in life, and the health of both is poor. (*c*) The nervous, excitable temperament of Mrs. Swinney, will tend to create in the child the same disposition. (*d*) The present financial condition of the respondents is that of bankrupts, and the future contingencies upon which they rely for the upbuilding of their fortunes, lack the requisite solidity to impress us with much hope of their future prospects being bettered in this regard. (*e*) By reference to Mrs. Swinney's testimony as to the interpretation placed by her upon the so-called contract, and her determination to retain the custody of Berenice after the ten years have expired, and to her manner of testifying, we are compelled by our own experience and by our own knowledge of human nature, to believe that the feeling exhibited by her toward the petitioner will be communicated to, and imbibed by the child, and that before the child reaches the age of ten years she will have become a stranger to her father, as far as her love and affection for him is concerned.

5th, That the letter attached to the respondents' return, and upon which they rely, is not a contract and was never intended to be a contract, or an agreement, or a memorandum of an agreement, in any manner whatever;

that it was simply intended for the purpose of relieving Mrs. Swinney's distress of mind and body for the time being; that the custody of Berenice has been a matter of discussion between the parties hereto ever since the date of that letter, and it was never interposed, or even mentioned, as being the ground upon which the respondents claimed the possession of the child, until nearly four years had elapsed from its date. The testimony further clearly shows that the letter was given—and the child allowed to remain with its grandmother during all these years—out of consideration and affection for Mrs. Swinney, and the subsequent events all go to show that none of the parties looked upon the letter as a contract or agreement—or upon the custody of the child as having been given to the grandmother by the father—but on the other hand it appears that the respondents have continually recognized the father's right to the custody of his little daughter by repeated expressions, indicating their apprehensions that he might exercise that right, and by their repeated demands of the promise from the father that the child should be returned to them whenever the father desired to take her to his home on a visit; and by the fact that the respondent, J. O. Swinney, assisted the petitioner in obtaining his appointment as guardian of Berenice by going on his bond, and finally by the fact that the respondents always looked to the petitioner for the payment of bills created in her behalf for clothing and medical attendance; that they did not regard the custody of the child transferred to them, or that they stood in *loco parentis* entitled to rights and assuming all the obligations and liabilities of a parent.

6th, The proof is overwhelming to negative the proposition of the respondents, that the health of the child will be impaired by removing her from the custody of the respondents and placing her in the care of her father. And while this point is no issue in the case, we have deemed it fit to produce testimony on it, so that the court might not hesitate for fear of doing the child harm in this behalf.

7th, The testimony further shows, that, if Berenice is not removed now, it will be impossible for the petitioner to obtain the custody of her when she arrives at ten years of age.   The testimony of Mrs. Swinney on this point is sufficient to convince any one that she never intends to give up the child as long as she can possibly avoid it.   Her interpretation of the so-called contract in her testimony, is very different from the interpretation put upon it by the respondents' return—and only goes to show that the letter is simply a make-weight, and not a *bona fide* defense to the petitioner's claim.

In conclusion, we have only this to suggest to the court : that this is a proceeding which involves not chattels, nor property, nor fortune, nor life, but more than these —the dearest and tenderest ties and interests that bind human hearts together and make society what it is, a human brotherhood ; which involves the strong, earnest affection of a father's heart, and the future welfare of a daughter whom he loves—and from whom he has been most unwillingly separated for many years.   For no small or uncertain reasons should a father be separated from his child, nor should a child be deprived of a father's affection and watchful care.   A letter written for a temporary purpose, after much solicitation and most unwillingly, as an act of love and kindness for another, and out of sympathy for her bereaved condition, should not, we respectfully submit, become the cause of a separation between a parent and child ; for no such reason should the child become an orphan as to her father's affection and a stranger to his home.

*Ewing & Hough* and *C. A. Winslow* for respondents.

The rule of law supported by the authorities as applicable to this case, may be thus stated :   *Prima facie,* the father is entitled to the custody of his minor children.   This is not an absolute and unconditional right, but depends

upon various considerations affecting the welfare of the children, and the relations existing by his act or permission between them and other persons.    While he may not make an absolute and irrevocable gift or contract, permanently disposing of their care and custody and his legal and natural obligations, so as to preclude him from reclaiming them, or to avoid responsibility for their care and maintenance, he may place them in the custody of others and permit them to remain, or contract for their temporary care and custody, under circumstances which will preclude him from disrupting the new relations created by his conduct or agreement, unless the interests of the child should demand it, and this, too, without any reference to his moral or pecuniary fitness to perform his natural and legal duties in the premises.    The primary consideration is the interest of the children, which includes everything pertaining to their welfare, moral, religious, social and physical.    The rights and interests of third persons to whom he may have committed their custody are to be considered and maintained, unless some interest of the children demands their repudiation.    *Chapsky v. Wood*, 26 Kas. 650; *s. c.*, 13 Cent. Law Jour. 494 ; *Pool v. Gott*, 14 Law Reporter 269 ; *Dumb v. Keen*, 47 Iowa 435 ; *Comm. v. Gilkerson*, 5 Clark (Pa. Law Jour.) 30; *Matter of Murphy*, 12 How. Pr. (N. Y.) 513 ; *Mercein v. People*, 25 Wend. 64 ; *State v. Libbey*, 44 N. H. 321 ; *Comm. v. Dougherty*, 1 Legal Gaz. Rep. (Pa.) 63 ; *Corrie v. Corrie*, 42 Mich. 509 ; *In the Matter of Bort*, 25 Kas. 308 ; *s. c.*, 37 Am. Rep. 255 ; *State v. Kirkpatrick*, 54 Iowa 373. It is settled that arrangements of this kind made with married women, the husband consenting, are valid.    *Bently v. Terry*, 59 Ga. 555 ; *s. c.*, 27 Am. Rep. 399.    The appointment of petitioner as guardian could not enlarge his parental rights, or aid him in avoiding the effect of what he had done as parent.    *People v. Kearney*, 31 Barb. (N. Y.) 430.

This case forms a peculiar and manifest exception to the general and well established rule of the common law

in regard to parental rights. Here, in every essential respect of character, social standing, moral fitness, and such financial ability as is at least equal to the proper and comfortable care and training of this child, the petitioner and respondent stand upon the same elevated ground. Other facts may be briefly cited as follows:

1. Upon the death of petitioner's wife, the grandmother was clearly admitted by all to have been the only person, then living, who was fully qualified by natural endowment and personal relationship, under all the immediate circumstances, then existing, to supply the place of mother to this child.

2. It was to her untiring devotion and watchful care that the recovery of the child from a very dangerous illness, at that time, was mainly due.

3. These facts were then recognized by the petitioner, and by them he was partly induced to confide his child to respondent, as stated in his letter.

4. Both parties have done well since that time. The petitioner has prospered every way in life. The child has developed into an interesting, lovely girl of nearly seven years of age, is as healthy as her delicate constitution will admit, is of rare sweetness of disposition, has had abundant mental, moral and religious culture, is entirely satisfied with her home, is devotedly attached to her grandmother, and loves her father, more, however, from the teachings of respondent than from any direct acquaintance with him, whom she has seen but once in the past twelve months and only three or four times a year since he gave her to her grandmother.

5. The petitioner never expressed, by word or act, any dissatisfaction with the arrangement he had made for his child, until a second matrimonial engagement was formed by him, and did not seek to change its custody until nearly one year after such marriage was consummated.

6. Many witnesses have proven the skill and care your respondent has shown in prudent watchfulness and

prompt treatment of the child, in everything pertaining to her physical condition and the preservation of her health.

7. The wife of petitioner has never been a mother, nor has she ever had care of the health and daily habits of any child; she is almost a total stranger to this child, and cannot, therefore, possess the knowledge, the natural affection or the skill which the management of so delicate a child demands.

8. At the age, and with the present health of petitioner and his wife, the probabilities are that they will have children, and, if so, those children must naturally engross the love and attention of the mother, to an almost exclusive degree, disadvantageously to this child.

9. Your respondent has reached the term of life, forty-nine years, when child-bearing is impossible, and if she be bereft of this child, the chief joy of her life is gone forever.

10. The father and sister of petitioner did, repeatedly, prior to commencement of this suit, express hearty approbation of the grandmother's care and management of this child, and of the father's act in leaving the child with her.

11. The only refusal or neglect on the part of respondent to conform to petitioner's wishes or directions concerning the child, has been in declining to surrender the custody of the child; and, after the commencement of this suit, governed by legal advice, her refusal to permit the child to visit him, unless he would promise to let her come back.

12. After petitioner demanded the surrender of the child, your respondent made several offers of compromise, which were rejected by him; and then she rejected the only one made in his behalf by his father, because to have accepted it would virtually have deprived her of all future comfort in the society of the child.

13. The respondent has accorded to petitioner every courtesy, save the surrender of the child, since the beginning of this suit, as she has always done, but he has exhib-

ited, for the first time, alienation from her, and has with-drawn all the accustomed terms, words and acts of affection which had so long characterized their relations, and has sought to impress her with the fear, that, unless she voluntarily relinquished the child to him, she need not expect, nor would he permit her to visit the child, nor the child to visit her, if he should get possession of her by law. And this threat he acknowledged in his testimony in stronger terms than charged.

14. Such change of feeling and conduct on his part, the cause of which is now but too apparent to her, very naturally and reasonably inspires her with extreme dread at the thought of being obliged to yield this child to the same influences which have so strangely altered the father, who hitherto had loved and treated her as a son.

15. Your respondent is firm and decided in her purpose, if the child shall remain with her, to so instruct her, and so to demean herself toward the petitioner, that she hopes, ere long, he will again recognize her as his true mother and friend, and the most faithful and competent guardian of his child.

16. Your respondent, impressed with her personal responsibilities to this child, declined to go with her husband to his conference appointments, and determined to buy and occupy a permanent home in Glasgow, and did so buy, at a cost of near $6,000, a home, and has occupied it with the child since the spring of 1879; the controlling and decisive idea governing her mind being, that the child's constitution was too delicate to risk the changing home life of an itinerant's wife, in its possible ill effects upon the child's health; and, also, to make a home where every social and educational advantage could be secured to the child as she might need them.

17. The best medical opinion, formed upon personal knowledge of this child's constitution and disposition, as likely to be affected by the changed influences, consequent upon her removal to the home of petitioner, declares that

In the Matter of Berenice S. Scarritt.

such a change would be at least hazardous, and might prove fatal.

18. Respondent having watched and nursed this child, day and night, through sickness and health, so long in her babyhood and early childhood, taxing her own strength often to the utmost, and sometimes perilling her own health, in order that the child should suffer in nothing that she could prevent, now that her efforts have been blessed, is she not fairly entitled to the fullest enjoyment in the society of this child which can be afforded by the custody of her person, at least some years longer?

19. The child having but just reached the age when she can begin to understand and appreciate all that her grandmother has done for her, ought she not to be permitted now to make such return as she can, by rendering all possible comfort and happiness to her mother's mother by her personal presence and love, some years longer, at least?

20. The cost of the maintenance of this child has been borne by respondent, just as if the child had been her own.

21. Your co-respondent did, by gift to her mother, furnish to this child property, which has been and is now held by petitioner as her curator, which is amply sufficient to support the child in a most comfortable style.

22. The property so owned by this child, is upon her death heritable by her father, if living at that time.

23. This child is the only living direct natural heir of your respondents.

24. It was the clearly expressed wish of the mother, living and dying, that the respondent should raise her child, and that mother was in a position to know all parties well, and judge of their fitness and qualifications.

25. In the father's new home the tie that binds—blood—will be wanting in all but him, and he will be mainly absorbed with business cares. The child's will must cross three other wills, comparative strangers, namely:

the step-mother and her mother and sister, all of whom are members of petitioner's family.

26.  The child is shown to possess a delicate constitution, and though generally enjoying fair health, she is subject to disease, impressible, as the testimony expresses it, and requires constant watching and care by one who thoroughly understands her constitution.  For this reason, the grandmother who has so long filled the place of mother is eminently fitted above all others to look after her physical welfare.

27.  The child has really known no other mother than the grandmother.,  From its birth to the present hour, she has watched over and cared for it as an only child, the ties of blood and relationship are close and strong, and the child looks upon and cherishes the grandmother as a natural mother.  Their affections and desires have thus become so interlaced that to separate them now would be scarcely different than separating a natural mother from her child under the same circumstances.

28.  In the proposed new home and its vicinity, there will not be a single blood relative of the child, save the father, not a single familiar association or face, not one in any way acquainted with the peculiar wants and necessities of the child, no one who can hope to fill the place of this grandmother; and, at the same time, the child will necessarily become exposed to new dangers.  While the testimony may tend to show that there is nothing in the situation of Kansas City rendering it particularly unhealthy for children, it is part of the statistical history of the country that the mortality of large cities largely preponderates against small children.

29.  As abundantly shown by the evidence, no child in Missouri has a more pleasant, healthful and happy home, or is the subject of more tender and affectionate care, or better moral, religious and physical training, than this child.  The grandfather possesses two scholarships in one of the most excellent schools in the State, located near

their home, which assures unequaled educational advantages. In this home, and amid these surroundings, the child is perfectly contented and happy. Looking solely to its interests, and duly regarding the rights of the father, under the peculiar circumstances of the case, what disinterested person would conscientiously advise a change?

In view of the facts and the law, we submit, in conclusion, that the court should maintain the *status quo*, at least until the petitioner shall have met the full measure of his legal and moral obligations to one who has nobly and generously supplied the place of a mother to his motherless and helpless child, and has been, even to him, a good Christian mother, counselor and friend.

RAY, J.—This is a proceeding, by writ of *habeas corpus*, at the instance of Edward L. Scarritt, to obtain the custody of the person of his child, Berenice S. Scarritt, alleged to be unlawfully withheld by the respondents, James O. Swinney and Maria C. Swinney, his wife.

The application states substantially that the petitioner, on July 8th, 1874, married respondents' daughter, and that there was born of this marriage, on May 20th, 1875, one child—the infant Berenice, the subject of this controversy; that her mother died August 28th, 1876, and that after her death petitioner removed to Kansas City, his former home, to practice law, but upon the urgent and repeated requests of the respondents, he was persuaded and did permit his daughter Berenice to remain with them, where she has been ever since, and now is; that on April 16th, 1878, the petitioner was duly appointed the guardian of the person and curator of the estate of his daughter, Berenice, and is still such guardian and curator; that on March 16th, 1880, he was married to Miss Maggie M. Morris, of Kansas City, and he owns and supports a comfortable home in that place, and in his profession as an attorney at law he is earning an income of at least $2,500 per year, and has, in addition to his home, other property sufficient to support and maintain

himself and wife and child comfortably and pleasantly; that he has no other children; that before and repeatedly since his marriage he has demanded of respondents the custody of his little daughter, which request respondents have at all times refused; that petitioner greatly desires the custody of his daughter, Berenice, and to take charge of her moral and mental and physical education; that the petitioner has the means to educate her, and a pleasant, loving Christian home to offer her.

The material parts of the return of respondents states substantially that they hold the child " by authority of the dying mother of said infant, and upon the further authority of a written request and contract made by the complainant, E. L. Scarritt, that the respondent, said Maria C. Swinney, the grandmother of said infant, should have the possession of the person of said infant until she should become at least ten years of age," that they further have the custody of said infant upon the subsequent repeated verbal confirmations of said written contract; that they have had the entire expense of said infant since its birth, and that, " relying upon the contract aforesaid, and expecting to retain and educate said child until she became at least ten years old, they bought a home at Glasgow, in Howard county, at the expense of $6,000, and located there; that if they had not had charge of said child, or had known that they were to give her up, they would not have bought said place and located there;" that they are capable and willing " to discharge the duties of a mother and father to said infant until the time fixed by said contract, to-wit: when she arrives at the age of ten years, and will then deliver her over to the custody of her father." The return further states that at no time prior to the 6th of February, 1881, did they refuse to permit said infant to visit its father; but at all times prior thereto permitted her to do so, frequently and without restraint; that, at the date last aforesaid, the petitioner demanded the possession of said child, and fearing that he might avail himself of

37—76

such a visit, and refuse to allow her to return, they did thereafter for that reason only, refuse to permit such a visit, unless the petitioner would promise not to detain her, which promise he refused to make; but they invited the petitioner to visit his daughter at their home in Glasgow, at his pleasure and whenever he desired. The return also denies that respondents unlawfully detain said infant from its father, or that he is lawfully entitled to its possession.

To this return is appended the letter of the 21st of September, 1876, from the father of the infant to its grandmother; and which is set up in said return, as the contract in question, by authority of which they claim the right to hold and detain said infant. That letter reads as follows:

SPRUCE MONT., NEVADA, }
September 21, 1876. }

MY DEAR MOTHER: For the love I bear you as the mother of my precious, beloved wife; for the love I bear you for your own Christian virtues for the sake of the tender ties which I know bind you to Anne's and my baby, I am constrained to give the possession of her person unto you, until at least she passes her first decade in life. O! mamma, you can never know what a terrible struggle it has been for me to bring myself to this conclusion. It is only my great love for you, my solicitude for my darling's welfare and religious training, that has overridden my selfishness, and brought me to the knowledge of what is best for my child. Make her consecration to God your first duty, my dear mother, and teach her, that, no matter what her father may be or do, his will, his heart's desire is to know that her life, her heart, her all is consecrated to God and to His holy service. Hold up the pure life and conduct of her precious mother ever before her eyes as an example for her to follow; but, above this, teach her that her mother's constant thought was to follow the example of Christ. And last, O, do not let her forget her father. Tell her often that she is the ballast which keeps him steady in his course of duty; that it is for her that he pursues his life

work, and explain to her, when she becomes old enough to understand, why it is that she has not been with her father during all of these long years. And, mamma, I say what follows in a spirit of love—love that a son should bear toward a father and mother—and if I do wrong and touch upon relations that are sacred to two hearts only, I know that your love for me will plead your forgiveness— teach our baby to love and reverence her grandpapa. Do not vie with him in winning her love—but tell her of his goodness, of his great, loving heart that sometimes over- flows in its impetuous solicitude for those he loves. In your solicitude for my baby, think also of him and the great love he bears you, and of the desolation and heart- aches his loss would bring. Let all our loves be like the broad ocean, filling every chamber of every heart; and let our ambition be to make those we love, love our loved ones, and above all love Christ. And, mamma, should you ever think it best at any moment to send my baby to me, let me know and she shall come; and should the sad dis- pensations of God's providence render you helpless, you and she shall be the care of my life. Kiss her every night for me, and may God's richest benedictions rest upon you both.

Your affectionate son,<br>Ed. L. Scarritt.

The material parts of the reply deny generally the new matter set up in the return, and then proceeds as fol- lows to-wit:

Your petitioner further states it is not true that re- spondents have been at the entire expense of the care and support of the said infant Berenice, since her birth; but that until the death of her mother, the same was borne wholly and entirely by your petitioner; that since the death of the mother of said infant Berenice, your petitioner has paid out considerable sums for medical bills and bills for clothing, and has been at all times ready and willing to pay any other reasonable charges created or incurred in her care

and support, and has, on all occasions, paid any bills presented to him by the respondents, or at their instance or request, in her behalf. It is true that most of the time since October 1st, 1876, the respondents have fed and lodged the said infant Berenice at their own expense, and, as far as your petitioner knows, they may have incurred bills for her clothing which have not been presented to him for payment. It is also true that said respondents have treated said infant Berenice as they would have treated a child of their own ; and it is also true that your petitioner signed the letter attached to respondents' return and made a part thereof, and which is designated in said return as a contract, but that said letter was signed by him under the following circumstances: Upon the death of the mother of said infant Berenice, your petitioner determined to at once remove to Kansas City, his former home, and there pursue his profession as attorney at law, and to take his daughter Berenice with him, and to reside with her at his father's house, at said place, his father, Rev. Nathan Scarritt, having urged and requested him so to do, and where she would be carefully, tenderly and wisely cared for, his father being a man of large fortune and strongly attached to your petitioner's child ; but before consummating this purpose, your petitioner went with respondents to Nevada, where respondent, J. O. Swinney, was engaged in mining ventures, and they took with them said infant Berenice; and that before and during their stay in said state, the health of the said respondent, M. C. Swinney, was in a very precarious condition, and your petitioner was daily urged and entreated by the respondent, J. O. Swinney, to give said child to respondents, and it was argued and urged that if he failed to do so, and took said child to his father's house, the consequences might prove serious and probably fatal to the health of respondent, M. C. Swinney ; this your petitioner wholly declined to do.

Finally, however, respondent, J. O. Swinney, urged upon your petitioner the necessity of doing something to

allay the anxiety and distress of respondent, M. C. Swinney, stating to your petitioner that if said Berenice was taken from the custody of the said M. C. Swinney, she, said M. C. Swinney, would, in her then physical and mental condition, surely die, and that if your petitioner would for the present forbear carrying out his resolution to take her to his father's house, but leave her with respondents, he, the said J. O. Swinney, thought such a sacrifice would be the means of saving the life of his wife, the said M. C. Swinney; whereupon your petitioner resolved to abandon his former purpose, and allow his daughter to remain for the time being with respondent, and so stated to respondent, J. O. Swinney, but at the same time told said J. O. Swinney that he, your petitioner, would not release his right to take his child at any time he might consider it for her benefit or advantage, to which the said J. O. Swinney responded that as soon as his wife, M. C. Swinney, recovered her health and strength, she would make no opposition whatever to his taking his child, and that he would engage that she would not. Your petitioner could not obtain access at this time to the respondent, M. C. Swinney, on account of her sickness, and was requested by J. O. Swinney to write her a note. and tell her of his altered resolution, whereupon your petitioner wrote the letter attached to respondents' return, and commended in all good faith to M. C. Swinney's care, for the time being, his only child. The reference in said letter to a "decade of years" and the word "constrained," were suggested by the respondent, J. O. Swinney. After said letter was written and read by the respondent, J. O. Swinney, but before its delivery by him to his wife, he stated that it was a letter written to save her life; it was understood and agreed between your petitioner and him that your petitioner's daughter should remain for the time being with respondent, but that in case he felt it his duty to take her into his custody at any time he should be allowed to have her, and this writing should be no obstacle thereto.

Your petitioner further states that never afterward did he, by word or act, fix the time, during which his infant daughter should remain with respondents, for the period of ten years or any other specific period. Your petitioner further states that he has no information and believes it is not true that the mother of said Berenice at any time before her death committed the care of her daughter to the respondent, M. C. Swinney. And he further states that it is not true, as he is informed, that the respondents, relying upon any contract made by him with them, purchased a home in Glasgow, Missouri, at the cost of $6,000, which otherwise they would not have bought. Your petitioner further denies that respondents were at the expense of taking said infant to Nevada for her health, but that said respondents went to Nevada for their own interests and pleasure.

As shown by the pleadings, this is a contest between the father of the infant in question, on the one side, and its grand-parents, on its mother's side, on the other.

There is but little, if any, dispute between the parties as to the law generally applicable to such contests. It is conceded that the father is the natural guardian of his child, and as such entitled to the custody of its person. It is also conceded that in contests of this sort it is the duty of the court to award the person of the infant to the custody of the father, unless it is made manifest to the court that the father, for some reason, is unfit or incompetent to take charge of it; or unless the welfare of the child itself, for some special or extraordinary reason, demands a different disposition of it, at the hands of the court. Such appears to be the language and current of authorities, to which we have been cited, or to which we have had access. Indeed, this is the admitted law. About this there is no controversy. It is also conceded that the father, by the common law, cannot irrevocably divest himself, even by contract with the mother, or any other person, of the custody of his children. It is held, both in England and in

this country, that an agreement by which the father surrenders the custody of his child, is not binding; and that he is at liberty to revoke his consent afterwards and obtain the child by writ of *habeas corpus*. In some of the states, under special circumstances, it has been held otherwise, but such is the manifest current of authorities, in this country, as well as in England. Schouler Domestic Relations, pp. 342, 343.

This author, in his admirable work, when treating of this subject, uses this language: "The general doctrine appears to us, on the whole, to be this: that public policy is against the permanent transfer of the natural rights of a parent, and that such contracts are not to be specifically enforced, unless in the admitted exception of master and apprentice, to constitute which relation requires, both in England and America, certain formalities, and excepting in some parts of the United States, where the principles of legal adoption are part of the public policy. American courts hold fast nevertheless, to the true interest and welfare of the child." p. 345. The same author, on page 345, uses this language: "It is held in England that an agreement by which the father surrenders the custody of his child is not binding; and that he is at liberty to revoke his consent afterwards, and obtain the child by writ of *habeas corpus*." On page 343 the same author adds: "If the father, after making an assignment of the services or society of his minor child, has re-taken the child into his own keeping, the assignee's only remedy, on this behalf, (if any he has,) is by action on the contract."    *    *

"Nor can the father, under the common law, divest himself even by contract with the mother, of the custody of his children, though he allows them to remain with her for several years."

To the same effect also, is Hurd on *Habeas Corpus*, who states the matter thus, at page 461: "In controversies between parents for the custody of their legitimate children, the right of the father is held to be paramount to

that of the mother; but the welfare of the child, and not the technical legal right, is the criterion by which to determine to whom the custody of the child belongs." Tyler on Infancy and Coverture, at page 278, states the law substantially to the same effect. In further support of these positions, see among other authorities the following: *Rust v. Vanvacter*, 9 W. Va. 600; *Commonwealth v. Briggs*, 16 Pick. 203; *Barry v. Mercein*, 3 Hill 399; *Ordronaux v. Chegaray*, 18 Wend. 637; *Rex v. DeManneville*, 5 East 221; *Herrick v. Richardson*, 40 N. H. 272; *Baird v. Baird*, 18 N. J. Eq. 195; *Paine v. Paine*, 4 Hump. (Tenn.) 523; *Nickerson v. ———*, 19 Wend. 16; *Johnson v. Terry*, 34 Conn. 263; *State v. Libbey*, 44 N. H. 321; *Mayne v. Baldwin*, 5 N. J. Eq. 454.

As to any mere article of property, either personal or real, the law permits a man to dispose of it, by gift or contract, as he chooses. Not so of his children. The father owes a duty to nurture, support, educate and protect his child, and the child has the right to call on him for the discharge of this duty. These obligations and rights are imposed and conferred by the laws of nature; and public policy, for the good of society, will not permit or allow the father to irrevocably divest himself of or to abandon them at his mere will or pleasure. Such, generally, is the admitted law of the case.

But it is contended for respondents that a father may place his child in the custody of others and permit it to remain, or contract for its temporary care and custody, under circumstances which will preclude him from disrupting these new relations thus arising, unless the interest of the child demands it. If that were so, let us see if it has been done in this case. Let us also see, if we can, what, if anything, there is in the facts of this case, which makes it our duty to depart from the acknowledged general rule, or disrupt one of the strongest and holiest ties that binds the race and preserves society.

In the first place it may be observed that the child,

Berenice, who is the subject of the contest, at the date of this controversy, is between six and seven years old, of a delicate but healthy constitution. She has, therefore, passed the age of helpless infancy, when the delicate and tender care and affection of mother and nurse are almost indispensable; and has not yet reached that period when the ties of kind treatment and long association may, perchance, equal if not supplant the holier and stronger ties of blood that bind together the father and child. Such, the evidence shows to be the age and condition of the lovely and interesting subject of this unhappy contest.

Its grand-parents, whom the evidence shows to be noble specimens of our race, distinguished alike for amiability, culture and deeds of labor and love, and endowed with all the wealth of parental affection for this child, which it is possible for grand-parents to cherish, are, it must not be overlooked, fast approaching, if not already in the decline of life, with health, never robust, much shattered and broken by unutterable sorrow for an only daughter, the mother of the child in question, and can scarcely hope to survive through all the years of its minority. It appears also that they have at this time, only the remnant of a once princely fortune, much of which is held by a precarious tenure, and it can hardly be expected that they can in the future, at their time of life, add much, if anything, to their present financial condition.

On the other hand, it cannot be ignored that the father and child are bound together, by ties that in their nature are nearer and stronger than it is possible for any relative in a remoter degree to feel or experience. The evidence shows him to be at the threshold of an early and vigorous manhood, with good habits and morals, an honorable profession, with a lucrative and growing practice. His financial condition, also, is shown to be ample and prosperous, his name without blemish, his social position and standing all that could be desired, and his home and family relations at once pleasant, happy and cultured. It is thus we find

him established in the midst of a growing and flourishing young city.

Under such circumstances can there be any doubt, as to what is for the best and permanent interest of this young girl?—Just at that period of life when her affections, intellect and character are to receive their impress for good or evil. Who is better qualified, or can have a greater interest than the father, to see that the impress is what it should be? Who also can fail to see that the filial and paternal affections of these parties are not only involved in this controversy but most likely staked upon its result.

It cannot be overlooked, that prior to this contest, the affections of the father and child, as well as those of his family, and that of respondents were all that they should be. It is noticeable, also, and cannot be overlooked, that an estrangement to some extent has already taken place between the father and the respondents. Under such circumstances it is of the first importance to protect as far as possible the welfare and happiness of this impressible child from the probable effects of that estrangement. It may not be possible to extricate all these parties from this contest, without disappointment and suffering somewhere; but the paramount consideration is, what is best for the welfare and happiness of the child itself. It may be no easy task, at all times to answer correctly such delicate and difficult questions, but in this case, if the instincts of filial and paternal affection are of any value, or if the voice of nature, which declares that the father is the natural guardian of his child, is worth anything, they furnish the only proper solution of this question. These ties and this voice should not be broken or hushed, if it can be avoided without detriment to what must be regarded as the best interest of the child itself. The evidence in the cause also speaks the same language.

This being so, it only remains to consider the validity, force and effect, if any, to be given to the alleged contract, as evidenced by said letter of the 21st of September, 1876,

from the father to the grandmother of this infant. Conceding, if it is permissible to concede, that the grandmother, being a married woman, is for the purpose of such a contract, under the statute, free from the common law incapacity incident to coverture; and conceding, also, that public policy did not, as it does, incapacitate the father from making a valid and irrevocable contract of this sort; and conceding, also, that the letter in question contained in other respects the essential elements of a valid and binding agreement upon the parties thereto, (all of which, to say the least of it, is very questionable,) let us see from the large mass of evidence before us, if we may or can, under what circumstances the same was dictated and executed; at whose instance and for whose benefit the same was gotten up and delivered.

From the testimony it is impossible not to see that this temporary disposition of the child was made at the special instance and request, and upon the urgent solicitation and importunity of the respondents, and for their accommodation and benefit, and reluctantly and unwillingly acceded to by the father for the best and most commendable motive: to save, if possible, the life of the grandmother from pending danger, as he was impressed and made to believe by her over-anxious and alarmed husband. The burden of the custody of this infant, if it can be considered a burden, was not thrust by an unfeeling father upon the care of an unwilling and reluctant grandmother, but on the contrary, the same was reluctantly and unwillingly conceded to the urgent importunities, and to gratify an over-fond and affectionate grandmother for the only child of her only daughter, and has so remained ever since. Such a gift or contract, if such it can be called, so made, can in conscience, ill afford to be made the basis of an absolute and irrevocable surrender, even for a limited time, (beyond the immediate and pressing necessity which alone dictated it,) unless the best interest and welfare of the child

itself demand it.   No such demand is apparent in this case.

Besides that, the letter in question, on its face proves, if proof was wanting, the great and absorbing love the father bore the child; the anxious solicitude he felt that the child might not forget its father, and the terrible struggle it cost him, to consent to her temporary detention by the grandmother.   No one can read that touching letter without being struck with the fact, expressly stated therein, that it was for the love he bore the mother of his wife, and for the sake of the tender ties that bound her to his child, that he was constrained to consent to this temporary gift to the grandmother.   It is plain to see, that this love and those ties, together with his solicitude for her welfare and religious training, constitute the sole consideration for the gift, and it is difficult, if not impossible, to see how such a letter, written for such a purpose, and under such circumstances, can be construed into a contract, within the meaning of that term, or how it can be held to have a valid consideration, as that term is usually defined, to give it obligatory force.   At most it seems to be a voluntary gift, on the part of the father, to gratify the love and accommodate the wishes of the grandmother.   There is no indication, in the letter itself, or in the circumstances under which it was written, that the parties thereto ever dreamed they were making a contract.   And if it should be held to be a contract, or to have a consideration, it would still be void, as against public policy, as we have before seen.

Had this contest arisen three or four years ago, during the period of helpless infancy; or had it been deferred until the child grew to be some twelve or thirteen years old, and the affections of long association and tender treatment had been allowed to supplant the ties of blood as in the case of *Pool v. Gott*, 14 Law Reporter 269, and other like cases, from Kansas and elsewhere, cited by respondents, (and which in important particulars are totally unlike the case at bar,) a different question would have arisen.

But occurring when it does and as it does, it obviates the calamity so much regretted and censured by the judges in the cases cited by the respondents, and leaves us no choice or discretion in the matter. Indeed, we cannot, if we would, avoid the conviction that the welfare and best interest of the child demand its surrender to its father and natural guardian, the said Edward L. Scarritt, and we so order and adjudge. All the judges concur, except HENRY, J., who dissents.

HENRY, J., DISSENTING.—There can be no question, on the evidence, that the petitioner voluntarily surrendered the child to the care and custody of respondents, for a definite period of time, which has not yet elapsed. There is no foundation in the testimony for the charge that he was unduly influenced by Mr. Swinney to make the disposition of the child which is evidenced by his letter to Mrs. Swinney. No false representations were made by Mr. Swinney, and it is not difficult to conceive that a lady in Mrs. Swinney's delicate health, attached as she was to the child, the sole offspring of her own only daughter, should be so seriously disturbed by the apprehension that it would be taken from her care and custody, as to impede her recovery from the ailment with which she was afflicted. To this effect were Mrs. Swinney's statements, and considerations like these are calculated to touch a father's heart, and prompt him to yield to the importunities of the grandparents of the child; especially when, as in this instance, the grand-parents are in every respect persons to whom its rearing may properly and safely be confided. It makes no difference that Mr. Scarritt reluctantly consented to the arrangement, if he then had capacity to give his consent. Having that capacity, the agreement is as binding upon him, as if he, instead of Mr. and Mrs Swinney, had urged its consummation.

Ordinarily the father is entitled to the custody of his minor children. There are no controverted questions of

law in this case, but the difference between my associates and myself, is with respect to the application of conceded legal principles to the facts established. That the father may, with or without a contract, confide the custody and rearing of his child to another suitable person, and thereby deprive himself of the right to have the child restored to his custody, is well settled. *Pool v. Gott and wife*, decided by the supreme court of Massachusetts in chambers, and reported in the 14 vol. of the Law Reporter 269, in many of its features bears a striking resemblance to the case at bar, and in the opinion delivered by C. J. Shaw, are the following observations: " There is no doubt that the father is *prima facie* entitled to the custody of his child. But this is not an absolute right. It may be controlled by other considerations. If unable or unfit to take charge of the child, and educate it in a suitable manner, the court will not interfere to take the child from the care of persons who are fit and able to maintain and educate it properly. This is an exception, however, which need not be considered in this case; for the evidence shows that the father is in a good situation, pecuniary, domestic and social, and of a character and reputation, against which, no objection can be made. By his own acquiescence he has allowed the affections on both sides to become engaged in a manner he could not but have anticipated, and permitted a state of things to arise which cannot be altered without risking the happiness and interest of the child. He has allowed the parties to go on for years in the belief that his legal rights were waived, and this relation of adoption sanctioned and approved by him. Under such circumstances I do not think that the petitioner is in a position to require the interference of the court, in favor of a controlling legal right on his part against the rights, such as they are, the feelings and the interests of the other parties." There was no agreement in that case by which the custody of the child was given to the grand-parents.

That a father, by or without a contract, may dispose

of the care and custody of his child to another suitable person, is held by many other American courts. *Chapsky r. Wood*, 26 Kas. 650; *s. c.*, 40 Am. Rep. 321; *Drumb v. Keen*, 47 Iowa 435; *Com. v. Gilkeson*, Pa. Law Jour. Rep. vol. 5, p. 30; *The case of Jos. Murphy*, 12 How. Pr. 513; *In the Matter of Bort*, 25 Kas. 308: *s. c.*, 37 Am. Rep. 255; *Verser v. Ford*, 37 Ark. 27.

It is clear from the testimony that the attachment between the grand-parents and the child is as intense as that which exists between a parent and child; and having, by his own conduct and agreement, encouraged its development, Mr. Scarritt should not now be permitted to sunder the relations between them. It was a regard for the well-being of the child, no less than a consideration of the grandmother's affection and anxiety for her, which prompted Mr. Scarritt to surrender Berenice to her grand-parents, and having deliberately established relations between them, which would naturally result in the mutual affection which exists between them, it would be cruel to both to deprive them of the comfort and happiness they find in each other's society.

When the little girl, then a babe, was confided to the care of her grand-parents, Mr. Scarritt was a widower, living at a boarding-house in Kansas City; or, at least, shortly after he became such boarder. His own mother was dead, having left a family of small children who were under the care of a step-mother; and at no place on earth could he have found for his child, a more suitable home than with her grand-parents. I do not share the prejudice which many entertain against step-mothers and mothers-in-law. No class of people have been more unmercifully and unjustly satirized, and I intend no reflection upon the step-mother of petitioner, when I say that it was barely possible that this little child would be as well cared for at the home of Mr. Scarritt's father, as at that of Mr. Swinney. It was certain that at the latter she would receive all the care and affection which the warm hearts of refined,

cultured grand-parents could bestow. She might have received the same at Mr. Scarritt's; but the petitioner did just what ninety-nine men in a hundred would have done, circumstanced as he was, without any suggestion except from their own hearts. Mrs. Swinney has lovingly and tenderly cared for little Berenice from her earliest infancy, nursing her in her sickness, watching by her bedside with anxious solicitude, under constant apprehension that her constitution was too frail to withstand the ailments peculiar to infancy; and having brought her through those manifold dangers, by the care and watchfulness which only a mother can bestow, until, instead of a ceaseless care, the little girl has become a comfort to her grand-parents, the father now asks this court, in the face of his solemn agreement, to restore her to his custody.

I am aware that the interest and welfare of the child is the paramount consideration with courts, in the determination of these cases, but the interests, feelings and welfare of the person to whom the child has been confided are not entirely disregarded. *Chapsky v. Wood*, 26 Kas. 650 In the opinion of the court, English authorities are cited' of which Lord C. J. Denman said : that the state of the law was such "as to render it odious in the eyes of the country," and Chancellor Walworth remarked with reference to them that the English courts "appeared to have gone back to the principles of a semi-barbarous age." 25 Wend. 93, 104, 105. The doctrines announced in those cases and the early American cases based on them, have been generally repudiated by the American courts, which, in the administration of this branch of the law, have advanced to a recognition of the sentiments of humanity.

In the *State v. Libbey*, 44 N. H. 321, it was held to be within the sound discretion of the court, whether the custody of the child will be given to the father, and that in determining the question, the court will consider not only the fitness of the father for the trust, but " the condition of the child with the person from whose custody it is sought

to be taken, its relation to them, the present and prospective provision for its support and welfare; the length of its residence there, and whether with the consent of its father, and the understanding, tacit or otherwise, that it should be permanent; the strength of the ties that have been formed between them, and, if the child has come to years of discretion, its wishes upon the subject."

That paragraph is a clear enunciation of the law on the subject, and commends itself to one's sense of justice. To the same effect is the *Case of Bort*, 25 Kas., *supra*, and in fact, every well considered American case recognizes this doctrine.

The welfare of the child is the chief, and every other consideration must yield to it, but when it is established by the evidence, that the welfare of the child does not require a change in its custody, although it may appear that the child would be as well cared and provided for by the father, the feelings, affection and interest of the custodian are to be considered in determining whether there should be a change in the custody. Can there be any doubt, upon the evidence in this case, that the child is well cared for by the grand-parents? That upon her health, morals and intellect, the highest care and culture have been and will continue to be bestowed? Can it be said that the child would be in better circumstances, under the care and management of a step-mother to whom she is comparatively a stranger, who has had no experience in rearing children, than with her grand-parents, who have transferred to her all the love they bore their own deceased daughter, the mother of the child? I do not question the ability or willingness of Mr. and Mrs. Scarritt to do all for the child that is to be expected of affectionate parents, whose social and financial position enables them to do all that could be desired for her, but am satisfied from the evidence, that the child will never be elsewhere as happy, as at her present home, or receive the same constant care and warm

affection which have been bestowed upon her by her grand-parents from her birth.

And, in addition to all this, there is the testimony of the physicians who have for years attended the child in her sickness, that removing her from her present home and surroundings to the City of Kansas, would probably endanger her life. This was the testimony of Drs. Vaughn and Collins, the former of whom is known throughout the State as an eminent surgeon and physician.

For the foregoing reasons I cannot concur with my associates in awarding to the petitioner the custody of the child.