# FRED REDMOND, by his Guardian JOHN RED-MOND, v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.

Division One, March 1, 1910.

1. **INSANE PLAINTIFF: Guardian After Suit Brought.** Where a plaintiff becomes insane after the institution of a suit in his name, the appointment by a probate court of a guardian for him and the adding of the name of such guardian to the caption of the case, after the plaintiff's name, thus, "by his guardian, John Redmond," is not the substitution of a new plaintiff, nor a revivor of the action in the guardian's name, nor was there any abatement. The suit will still proceed to judgment in the name of the plaintiff, but under the control of the guardian.

2. **GUARDIAN: For Person Without Property: Act of 1903.** The General Assembly has no authority to enact a statute providing that "the probate court shall have no jurisdiction to inquire into the insanity of any person who is the owner of no property." The Act of 1903, so declaring, is unconstitutional, because the Constitution vests the probate court with the power to appoint guardians of persons of unsound mind.

    WOODSON, J., in a separate opinion, raises the question whether or not a right of action arising out of tort is property, such as to warrant the appointment of a guardian or administrator.

3. **INSANE PLAINTIFF: Appointing Guardian: Scheme to Avoid Deposition.** The fact that plaintiff's deposition was taken and immediately thereafter proceedings were brought in the probate court, to have him adjudged insane, under the circumstances of this case, lends color to defendant's complaint that these steps disclose a scheme to avoid the bringing of plaintiff into court where the worth of his testimony could be considered by the court and jury, but it only tends to weaken confidence in the correctness of the verdict, and does not affect the question of law as to permitting the guardian to manage the litigation.

225 Sup—46

Redmond v. Railroad.

4. ———: **Deposition: Suppression.** Where the evidence of plaintiff's insanity at the time his deposition was taken and before he was adjudged insane was not sufficient to justify the court in suppressing the deposition, the jury may, nevertheless, be instructed to consider the evidence of his incapacity as affecting the weight to be given to his testimony.

5. **DEPOSITION: Taken by Attorney's Partner.** A deposition taken by a notary public who was a partner of one of the deponent's attorneys, not in the practice of the law, but in the insurance business, should be suppressed, if objection was made on that ground at the time it was taken, or if it be made to appear that the notary acted unfairly; but otherwise, it should not be suppressed on that account.

6. ———: **Leading Questions.** A deposition cannot be suppressed on the ground that the questions were leading, unless objection to their form was made at the time it was taken.

7. **NEGLIGENCE: Demurrer to Evidence: Conflict.** Where there was a conflict in the evidence, and if plaintiff's were true his injury was due to defendant's negligence, and if defendant's were true it was not received in the way charged in the petition, a demurrer to the evidence should not be sustained.

8. ———: ———: **Knowledge of Danger: Distance of Car From Track.** Plaintiff, while mounting a ladder of a box car, which by a flying switch was being set in on a switch, was struck by a car on another switch, which he had helped put upon that switch and several times thereafter while on top of other cars had passed. *Held*, that his knowledge that the car was there was not knowledge that it was so close to the main track as to endanger a brakeman on the ladder of a passing car; and being under the immediate supervision of the yard-master, who for that time was his master, and who he had a right to trust had done his duty, he was under no obligation to measure the distance from the ladder to the car on the switch.

9. ———: **Master's Knowledge: Instruction: "For a Long Time."** Where the defendant, in the person of the yard-master, was present, and he knew that the car, with which plaintiff, while riding on the ladder of another car on the main track, had come in contact, had been set in on the side track, it is immaterial that the instruction required the jury to find that defendant "suffered the car to remain for a long period of time" in close proximity to the ladder of a passing car, there being no evidence on which to base those words. Where there is no question of the master's knowledge, the duration of the condition, out of which implied notice comes, is immaterial, and the words were harmless.

Appeal from Caldwell Circuit Court.—*Hon. J. W. Alexander* and *Hon. Frank H. Trimble,* Judges.

AFFIRMED.

*H. T. Herndon, J. G. Trimble* and *O. J. Chapman* for appellant.

(1) An insane man cannot be party plaintiff in a lawsuit. Hayes v. Miller, 81 Mo. 424. The petition was a suggestion of ''disability'' (R. S. 1899, sec. 756), and was so treated by the court, but the law governing revival of causes was not followed. R. S. 1899, secs. 758, 759. (2) Appellant's motion to dismiss being equivalent to, and in effect, a plea in abatement, should have been sustained. (a) The cause had not been properly revived. R. S. 1899, secs. 758, 759. (b) The probate court was without jurisdiction to inquire into the sanity of Fred Redmond, and the appointment of John Redmond guardian was null and void. Sec. 3650, R. S. 1899; Carter v. Bolster, 122 Mo. App. 135; Dixon v. People, 63 Ill. App. 590; Townsend v. Townsend, Pick. (Tenn.) 17; Borden v. Croak, 33 Ill. App. 392; Webb v. Bowler, 5 Jones (N. C.) 1; Pippin v. Ellison, 34 N. C. 64; Gibson v. Gibson, 43 Wis. 23; Railroad v. Swayne, 26 Ind. 477; Perry Admr. v. Railroad, 29 Kas. 420; Mallory v. Railroad, 53 Kas. 557. (3) Motion to suppress deposition of Fred Redmond should have been sustained. (a) He had been confined in an insane asylum because insane, and was not discharged as having recovered. The subsequent proceedings show the trick that was intended to be played. By the aid of leading questions on the important point, a deposition was to be obtained at a time and place when the jury and court could not see the plaintiff and no satisfactory cross-examination could be made. A doctor was present to aid in the taking of deposition. Stops had to be made to allow the witness to be taken to the open air. A finding of insanity was obtained in

the probate court for the purpose of preventing his being put upon the witness stand. In the opinion of disinterested people who saw him frequently, he was not sane at any time. Such conduct should not be sanctioned by the court, and its perpetrators allowed to fatten by means thereof. (b) The deposition should have been suppressed, because taken before a partner of one of the attorneys, and it is immaterial that the notary was not himself an attorney. Stewart v. Emerson, 70 Mo. App. 482. A notary public in taking depositions acts as a temporary substitute for the court in which the cause is pending. In taking depositions he acts in a judicial capacity. Swink v. Anthony, 96 Mo. App. 420; Ex parte Livingston, 12 Mo. App. 83; Ex parte McKee, 18 Mo. 600; R. S. 1899, secs. 1614 and 1760; Dodd v. Northrup, 37 Conn. 216.

*Pross T. Cross, John A. Clark, R. H. Musser, John A. Cross* and *John C. Carr* for respondent.

(1) Defendant will not be permitted to raise the issue of the propriety of the appointment of John Redmond, guardian, for the reason that the judgment of the probate court making such appointment imports verity, and is binding and conclusive, and not subject to collateral attack. Hardin v. Lee, 51 Mo. 241; Crow v. Meyersieck, 88 Mo. 411; Brawford v. Wolfe, 103 Mo. 391; McKenzie v. Donnell, 151 Mo. 432; Payne v. Burdette, 84 Mo. App. 332; In re Estate Davison, 100 Mo. App. 263. (2) And such judgments and orders of probate courts are entitled to the same favorable presumption in respect to their validity, as is accorded to those of courts of general jurisdiction, and are not more open to collateral attack than judgments of the latter courts. Sherwood v. Baker, 105 Mo. 472; Price v. Association, 101 Mo. 107; Macey v. Stark, 116 Mo. 481; In re Davison Estate, 100 Mo. App. 263. (3) In any event, before the appointment of John Redmond, guardian, could be held void, the

record of the probate court would have to show, affirmatively, upon its face, that Fred Redmond was not the owner of any property. Johnson v. Beazley, 65 Mo. 250; Cox v. Boyce, 152 Mo. 576. (4) The insanity of plaintiff was no cause for the abatement of the case, and plaintiff, although insane, could prosecute said suit in his own name and without a guardian, and without revival. Koenig v. Railroad, 194 Mo. 571; Allen v. Ransom, 154 Mo. 454; Crow v. Meyerseick, 88 Mo. 794; Waller v. Clay, 21 Ala. 797. (5) Even if it should be conceded that the appointment of the guardian was void (which we do not concede), yet it would in no way constitute error, or prejudice the defendant; but in that event, the appointment, being void, would be without effect, and the so-called guardian would be merely an unnecessary but harmless party—such as could be dropped from the record at any time, since Fred Redmond, who, although insane, is still the plaintiff, can prosecute the suit in his own right and name, without guardian, and in fact employed his attorneys and instituted the suit while sane. Jones v. Railroad, 178 Mo. 538; Koenig v. Railroad, 194 Mo. 570. (6) Whatever irregularity there may have been in the taking of said deposition by the notary, on account of his relation to an attorney, was waived by defendant. Edmunds v. Griffin, 41 N. H. 529; Crowther v. Rowlandson, 27 Cal. 376.

VALLIANT, J.—Plaintiff in his petition avers that he was a switchman and brakeman in the employ of the defendant railroad company; that while he was engaged in the performance of his duty as such, in defendant's switch yard at Milan, on January 11, 1903, standing on the ladder on the side of a car that was being switched, he was struck against another car that was standing on a side track, knocked off, thrown to the ground and received severe personal injuries, for which he sues to recover damages. The trial resulted

in a judgment in plaintiff's favor for $10,000, from which the defendant appealed.

The petition alleges four grounds of negligence: first, that by negligently placing, and suffering to remain, the car on the side track in such dangerous proximity to the track on which was the car plaintiff was riding as to strike the plaintiff, the track and yards were rendered not a reasonably safe place for plaintiff to work in; second, defendant's servants in charge of the engine drawing the car on the ladder of which plaintiff was standing, saw or by the exercise of reasonable care would have seen the dangerous proximity of the car on the side track and known plaintiff's position on the ladder and the danger that threatened, yet failed to warn him; third, that seeing and knowing the danger to which plaintiff was so exposed the defendant's servants in charge of the engine ran it at a dangerous and unsafe rate of speed; fourth, that the switch yard was not properly lighted.

The original petition was filed in the name of Fred Redmond plaintiff. It was filed December 9, 1905, and on December 18, 1905, his deposition was taken in his own behalf at Lathrop, Clinton county. On April 11, 1906, one John Redmond, the father of Fred, filed in the probate court of Clinton county an affidavit alleging that Fred was of unsound mind caused by the injuries received in this accident, and praying an inquisition *de lunatico* be instituted. Thereupon notice to Fred was issued and served the same day and two days later, April 13, the inquisition was held and he was found to be insane, so adjudged, and John Redmond was appointed guardian of his person and curator of his estate and required to give bond in the sum of one hundred dollars, which he did and was in due form qualified as such guardian and curator. On the same day, April 13th, John Redmond filed a motion in the form of a petition in the circuit court of Clinton county in this cause, stating that Fred Red-

mond, although sane when he instituted this suit, had since become insane and incapable of conducting the suit, that John Redmond had been duly qualified as his guardian, and prayed to be made a party plaintiff. Defendant objected to having the cause revived in the name of the alleged guardian, particularly at that time, for the reason that defendant was not in court for that purpose, there having been no *scire facias* issued against it. The objections were overruled and exceptions saved.

John Redmond as guardian was then allowed, over the defendant's objection, to amend the original petition by interlining in the caption thereof after the name, Fred Redmond, the words "by his guardian John Redmond," and in the body of it a statement to the effect that although Fred was sane when the suit was begun, yet he had since become insane and John Redmond had been appointed his guardian; in other respects the petition was left as original. Defendant preserved all its exceptions to that proceeding in a term bill of exceptions filed at the time. After that a change of venue was granted to defendant to Caldwell county, and the cause was transferred to the Caldwell Circuit Court. On the first day of the next term of the Caldwell Circuit Court defendant filed a motion to dismiss the cause, because, first, if Fred Redmond has become insane since the commencement of this suit, as stated in the amended petition, the cause has not been properly revived and John Redmond is not a proper party; and, second, the probate court of Clinton county had no jurisdiction to hold an inquest or to appoint a guardian for Fred Redmond, because he had no property. To sustain its motion the defendant introduced in evidence the petition of the plaintiff to the Clinton Circuit Court for leave to sue as a poor person in which it is stated that he "has no money or property whatever." Also the record of the probate court in the matter wherein

the inquisition was held and the guardian and curator appointed, which showed that Fred Redmond had nothing in the way of property but this suit for damages. The court overruled the motion to dismiss and exception was duly saved.

After that proceeding the defendant filed its answer to the amended petition, in which after admitting its incorporation it denies all other allegations, makes special denial that John Redmond was legally appointed guardian, also makes special denials of some allegations that are sufficiently traversed by its general denial. Then the answer pleads as contributory negligence on the part of the plaintiff that if the car on the side track was a danger menacing the plaintiff's safety, plaintiff knew it was there, had frequently passed it and had himself put it in that position, and if there was any risk on account of defective lights it was obvious and plaintiff was well aware of it. The answer also pleads a contract entered into by plaintiff with defendant on the occasion of his employment to the effect that he released the railroad company from liability for injuries he might receive through the negligence of plaintiff's fellow-servants; also a contract reciting to the effect that he was instructed when he entered into the employment that it was dangerous and that he assumed the risk. The reply was a general denial and a plea that the contracts pleaded in the answer were in violation of section 2876, Revised Statutes 1899.

I. As to allowing John Redmond as guardian to interpose in the case. The point is discussed on both sides as if John Redmond as guardian was substituted for Fred Redmond as plaintiff; it is also considered in the brief of defendant as if by the action of the court the cause was revived in the name of the guardian. But there has been no displacement of Fred Redmond as plaintiff, no abatement and no revivor. John Redmond as guardian is not the plaintiff, it is

Fred Redmond, plaintiff, represented by John Redmond his guardian. The title to the property of an insane person does not vest in the guardian or curator, but it remains in the insane person, the guardian or curator having only the care and control of it. The judgment in this case is not a judgment in favor of John Redmond, guardian, but it is a judgment in favor of Fred Redmond.

If a plaintiff die pending a suit, the cause must be revived in the name of his administrator and on suggestion of death *scire facias* must issue, but that proceeding has no place in a suit where the plaintiff becomes insane. If an insane person is sued, the court will appoint a guardian *ad litem* or other suitable representative to guard his interest, but if a judgment against the defendant were rendered it would not be a judgment against the guardian *ad litem* but against the insane person.

It has been held by this court that a suit could be maintained in the name of an insane person not in ward. [Allen v. Ranson, 44 Mo. 263; Koenig v. Union Depot Co., 194 Mo. 564.] But where a guardian has been regularly appointed, the duty devolves on him to attend to the suit for his ward. [Sec. 3667, R. S. 1899; Ann. Stat. 1906, p. 2063; Hayes v. Miller, 81 Mo. 424.]

Defendant complains that by first instituting the suit in the plaintiff's own name and on his own responsibility, then immediately taking his deposition and, before the cause could come on for trial, going into the probate court and having him declared insane and a guardian appointed, discloses a scheme to avoid bringing the plaintiff into court where the worth of his testimony could be considered by the court and jury. And force is given to that complaint by the fact that there was no eye witness to the accident, and the only testimony tending to show that the plaintiff was struck by a car on the side track was his own testimony

in that deposition, and his evidence on that point came out mainly in answers to leading questions, whilst there was a good deal of evidence of circumstances tending to the contrary. But whilst that fact tends to weaken confidence in the correctness of the verdict and does not justify an appellate court in saying that the judgment is so clearly for the right party that in spite of some errors it ought to be sustained, yet it cannot affect the question of law as to the admission of the guardian to manage the litigation.

The General Assembly in 1903 passed an act amending section 3650, Revised Statutes 1899, by adding thereto this proviso: "Provided, that the probate court shall not have jurisdiction to inquire into the insanity of any person who is the owner of no property." [Laws 1903, p. 200.] The record in this case shows that Fred Redmond owned no property, a claim for damages in an action in tort is not property within the meaning of that act, therefore if the act of the General Assembly is valid the probate court had no jurisdiction to institute the inquisition *de lunatico*, or appoint a guardian. But in passing that act the General Assembly doubtless overlooked section 34, article 6 of the Constitution, which is as follows: "Sec. 34. The General Assembly shall establish in every county a probate court, which shall be a court of record, and consist of one judge, who shall be elected. Said court shall have jurisdiction over all matters pertaining to probate business, to granting letters testamentary and of administration, the appointment of guardians and curators of minors and persons of unsound mind, settling the accounts of executors, administrators, curators and guardians and the sale or leasing of lands by administrators, curators and guardians; and also jurisdiction over all matters relating to apprentices: Provided, That until the General Assembly shall provide by law for a uniform system of probate courts, the jurisdiction of probate

courts heretofore established shall remain as now provided by law.''

By that section full jurisdiction is conferred on probate courts to appoint guardians and curators for persons of unsound minds. What the Constitution has given the General Assembly cannot take away or curtail. The Constitution does not limit the jurisdiction of the probate court to cases in which the insane person owns property, but the jurisdiction is over all such persons. The probate court cannot appoint a guardian of an adult person until it has ascertained that he is insane, and jurisdiction to appoint the guardian necessarily carries the jurisdiction to institute and carry through the inquiry as to his mental condition. An insane person needs a guardian of his person even though he have no property, a curator is needed only when there is property or property interests to be protected.

Where jurisdiction is conferred by the Constitution the General Assembly has power to prescribe the mode of procedure in which that jurisdiction is to be exercised and so it has done by the enactment of section 3650, Revised Statutes 1899, prescribing the course to be pursued by the probate court in such case, but the proviso aimed to be added to that section by the Act of 1903 is not the prescribing of a procedure but a curtailment of the jurisdiction which the Constitution conferred. We hold that the act of the General Assembly entitled ''An Act to amend section 3650, chapter 39, of the Revised Statutes of Missouri, 1899, entitled insane persons,'' approved March 25, 1903, is unconstitutional. It follows therefore that the judgment of the probate court of Clinton county appointing John Redmond guardian of Fred Redmond is valid.

II. Before reaching the facts of the case it may be as well to consider another preliminary matter. When the cause was lodged in the Caldwell Circuit Court defendant filed a motion to suppress the depo-

sition of the plaintiff on the grounds that he was insane when the deposition was taken and the notary who took it was a partner of one of the attorneys for the plaintiff; he was not a law partner, but a partner with the attorney in the business of insurance agents.

As to the first ground, there was evidence tending to show that the man was insane. He had been an inmate of the lunatic asylum at St. Joseph. During the taking of the deposition he was attended by a physician, and several times the proceeding had to be suspended to allow him to get out in the open air and recover his nerves, but up to that time there had been no adjudication of his insanity, therefore whether or not he had sufficient mental capacity to give testimony in the case was an open question, and the evidence on that point bore on the question of the weight to be given to his testimony. There was sufficient evidnce to justify the defendant in contending before the jury that the testimony was unreliable on account of mental incapacity, and at defendant's request the court instructed the jury on that point that if they believed from the evidence that when the plaintiff gave his deposition he "was feeble-minded and mentally unbalanced, then they will take such fact into consideration in weighing his evidence and in determining what credit they will give his testimony in the case." We do not think the plaintiff's mental incapacity as shown by the evidence was so obvious as to have justified the court in suppressing the deposition on that ground.

As to the second ground, that the notary was a partner of one of the attorneys, we think that would have been good ground to suppress the deposition if timely objection had been made. A notary taking a deposition to be used as evidence in a cause pending in court acts in a judicial capacity and should be entirely disinterested. [Swink v. Anthony, 96 Mo. App. 420.] Not only in taking down the questions

and answers, but in the whole conduct of the proceeding the notary should exercise a judicious and a judicial discretion. In a case like this, for instance, if a witness should appear before a notary in a condition from which the notary becomes satisfied that he is not responsible for what he may say, an intelligent and impartial notary will refuse to take his deposition. A conscientious and intelligent notary will conduct the taking of a deposition as fairly and impartially as a judge on the bench, or if he should fail to do so the deposition may be impeached. In the case before us, however, there is no charge made that the notary acted unfairly in any respect. And it does appear that one of the attorneys for defendant who was present knew that the notary was a business partner of one of the attorneys for the plaintiff, but he made no objection to the notary on that ground; if such objection had been made and overruled, the deposition should have been suppressed. It also appeared in evidence on the hearing of this motion that the attorneys for defendant had present a stenographer who took down all the proceedings and there was no variance between his report and that of the notary. The court did not err in overruling the motion to suppress.

III. While we are on the subject of the deposition we will consider the objections to certain parts of it that were made when it was offered in evidence at the trial. Those objections were on the ground that the questions were leading and that the answers were suggested by the questions. The questions indicated are leading, but there was no objection interposed at the time before the notary on that ground. An objection to the mere form of a question is waived unless made before the notary at the time it is propounded; in that respect it differs from an objection on the ground of incompetency, for if the testimony drawn out before the notary is incompetent the ob-

jection may be made for the first time when the deposition is offered in evidence.   •

• IV. The testimony on the part of the plaintiff tended to show as follows:

He was a switchman and brakeman in the employ of defendant in its switch yard at Milan. The yard lies north-and-south, the larger part of it being south of the depot, and in that part there are several switch tracks running off from the main line, but they are only incidentally mentioned in the evidence. The main track runs north and south through the yard. Coming up the main track from the south when you reach the north end of the yard, a switch track turns off to the east, it is called the River track; further north, probably 80 feet, another track turns off to the west, it is called the Kansas City track. On the night of January 11, 1903, about eleven o'clock, plaintiff as one of a switching crew was engaged in switching cars from the main track to the Kansas City track. The train, consisting of an engine headed north drawing two box cars and a caboose, was coming from the southern end of the yard; they were aiming to make a flying switch, that is, to gain such momentum as that when the coupling with the engine was severed the cars would move on to the Kansas City track where they were to be placed. The engine was going twenty-five to thirty miles an hour, which was faster than usual. In the performance of his duty in that particular when the train reached the proper distance from the switch of the Kansas City track, plaintiff drew the coupling pin and signaled the yard master, who, as soon as the engine had passed, threw the switch to let the cars into the Kansas City track; the point where the plaintiff drew the coupling pin and gave the signal was just north of the River track switch; as soon as he drew the pin he began to climb the ladder on the east side of the front box car for the purpose of getting on top and setting the brake,

and while in that act his body came in violent contact with a car standing on the River track, he was thrown to the ground and knocked senseless. He testified that he did not see the car on the River track until it was too late to avoid it, did not know it was there and did not know who put it there; that there was no light in the yard at that point except his lantern. The injuries received by the plaintiff were very serious and distressing.

The testimony on the part of defendant tended to show as follows:

There had been some cars placed on the River track during the day, just how many or where, the evidence is not definite, but they were placed there to make up a train to go east that night. The crew to which Redmond belonged came on duty at 7 o'clock in the evening and were engaged switching cars until about 9:30, during which time they brought cars from the south part of the yard and switched them onto the River track; in doing so they passed the cars that had been placed on the River track during the day several times. Redmond rode the cars in, set the brake and gave the signal to the engineer when to stop; the engineer testified that during that time he passed the cars several times and observed that the cars cleared the cab of the engine at least two feet. The crew quit work at 9 o'clock and went to the depot to await the coming in of a train which they called "Gilbert's train;" after that train came and had been inspected it was reported as ready to be "broken up," and the crew again went to work taking cars from that train and placing them on the River track, Redmond riding the cars in and setting the brakes. It is to be inferred from this evidence that in making these switches they went further north on the main line and entered the River track from the north end, else they would not have passed the cars already stationed on the River track. After doing that work the crew went to the

south end of the yard and got these two box cars and
caboose, in the setting of which on the Kansas City
track this accident occurred.  The yard master tes-
tified that when they approached the Kansas City
switch he went forward to the switch so as to be in
place to throw it, Redmond took his place near the
front end of the car next the engine to be ready to
uncouple the engine from the cars, he drew the coup-
ling pin, gave the signal and then began to climb the
ladder to get on top to set the brake when the flying
switch should be made.  At the time Redmond began
to climb the ladder the front end of the car was near
the River track switch and he was about half way up
the ladder when the yardmaster last saw him; the
engine being cut loose went on up the main track,
while the cars were carried by their momentum on to
the Kansas City track; they stopped at the place in-
tended.  The yard-master did not see Redmond again
until he saw his unconscious body lying between the
main track and the River track near the north end
of the first car on the River track.  The engineer tes-
tified that when he came back Redmond was lying be-
tween the River track and the main track just west
of the cars that were on the River track.  There had
been a light snowfall that night covering the ground
and the tops of the cars.  One of defendant's wit-
nesses, the telegraph operator, who when he heard of
the accident came up to assist, testified that the plain-
tiff was lying on the west side of the Kansas City
track, but all the other witnesses for defendant tes-
tified that he was east of the main track and between
it and the River track.  There was some confusion
in the evidence as to the points of the compass, the
yard lay north-and-south, but the witnesses sometimes
call the north the east, and the south the west, though
when their attention was called to it they gave the cor-
rect compass points.

There was expert testimony on the part of defendant tending to show that the plaintiff did not have mental capacity at the time he gave his deposition to recollect or state how the accident occurred.

a.  At the close of the plaintiff's evidence, and again at the close of all the evidence, defendant asked an instruction in the nature of a demurrer to the evidence, which the court refused and exceptions were saved, and appellant now insists that those instructions should have been given.

Appellant's contention is that the undisputed circumstances in the case show that it was impossible for the accident to have occurred as plaintiff testified that it did occur.  Defendant's theory is that Redmond had climbed to the top of the car, set the brake, and from some cause, probably the loose snow on top of the car, had slipped and that he fell from the top of the car.  In support of this theory it is contended that as he began climbing the ladder just after the car had crossed over the River track switch, which was eighty feet south of the Kansas City switch, he had ample time in which to have climbed to the top of the car and set the brake before he reached the point where he was found on the ground, and the cars having stopped at the point where it was aimed to have them stop, shows that the brake was set.  And also that if he had been struck while he was on the ladder by a car on the River track he would not have fallen where he was found, that is, near the north end of the first car on the River track, but would have fallen to the south end of that car.  The train could not have been going at a very high rate of speed because as it approached the switch the plaintiff got down to uncouple the engine and then got back on the ladder; after the engine was uncoupled from the cars it went on up the main track and after it crossed over the Kansas City switch the yard-master threw the switch and let the cars in on the Kansas City track.

Appellant also argues that if the cars standing on the River track were dangerously near the main track, the plaintiff knew they were there, had been passing by them in switching other cars on to that track for the space of two hours, and had assisted in placing them there himself. The plaintiff testified that the accident happened in the south end of the switch yard while all the other evidence shows that it occurred in the north end, but that is an immaterial fact, except that it is one that may be taken into consideration when the trier of fact is determining what weight should be given his testimony.

There was no direct evidence on the part of the plaintiff to show where he fell to the ground, his evidence was that after he was struck he became unconscious and knew nothing more. It is argued for the plaintiff that if he had reached the top of the car and set the brake before he fell, the car would not have passed into the Kansas City track, because the point where he was found on the ground was south of the Kansas City switch. There is reason in the arguments of both sides on that point, but neither is conclusive; other facts are to be taken into consideration.

There was evidence on the part of defendant tending to show that the plaintiff knew these cars were on the River track and had passed them several times that night. That was probably the truth, but his knowledge that the cars were there was not knowledge that they were so close to the main track as to endanger a brakeman on a ladder passing. His position on other cars he had been riding to brake, was on top, and in that position he might have passed those standing cars in safety, in fact he would have passed in safety on the car from which he fell if he had been on top; the only time he attempted to pass on a ladder was when he met this accident.

Although he saw the cars standing on the River track he was under no obligation to measure the distance, he was working under the immediate supervision of the yard-master, who, for that time, was his master and he had the right to trust that the yard-master had done his duty in that respect.

In the conflicting condition of the evidence the trial court could not have done otherwise than submit the issues to the jury.

b. It is complained that the main instruction given for the plaintiff was erroneous because it submitted to the jury the question of the master's negligence in suffering the cars to be and remain on the River track so near the main track as to make the place not reasonably safe for the plaintiff to work in, and in that connection, it is contended that when the master furnishes a reasonably safe place for the servant to work in he is not liable for a transitory danger arising out of a single occurrence in which he is not at fault and of which he has no notice or opportunity to correct. There is no doubt of the correctness of that proposition. But here the master, in the person of the yard-master, was present, the situation was seen by him, and if it was dangerous it was easy to correct. The language of the instruction especially criticised is: "And if the jury believe from the evidence that the defendant, through its agents and servants in said yards at Milan, negligently placed, or negligently permitted or suffered to remain for a long period of time a certain car on a certain side track," etc. The complaint is of the words "suffered to remain for a long period of time." Those words should not have been in the instruction because there was no evidence on which to base them. The cars had only been there a few hours, were placed there in making up a train that was to go out later that night. But those words were harmless in this instance. The length of time the cars remained there did not render them more

dangerous or more liable to produce this particular accident. The significance of the fact that a dangerous condition is suffered to remain a long time is that it indicates that the master had notice of it, but when there is no question about the master's knowledge the duration of the condition is immaterial.

c. It is also complained that the instruction ignores the plea of contributory negligence which there was evidence to sustain. The instruction contains these words: "and if the jury further find from the evidence that plaintiff was exercising ordinary care and caution in riding on the said ladders of said car in the way at the time aforesaid, and was not guilty of any negligence on his part contributing directly to produce such injury," etc. There was an instruction defining negligence and ordinary care. At the request of the defendant the court gave among others the following two instructions:

"No. 7. If the jury believe from the evidence that plaintiff himself was careless or negligent at the time and place of the accident and that such negligence directly contributed to the injury which he sustained, then plaintiff cannot recover damages in this cause and the verdict should be for the defendant.

"No. 8. The court instructs the jury that it was the duty of Fred Redmond at the time mentioned in the plaintiff's petition, to exercise for his own protection from injury such care and caution as is usually exercised by prudent, careful persons under like circumstances, and if he failed to exercise such care and caution and such failure was the cause of, or contributed to the injury, then the jury will find for the defendant."

An instruction on the point of contributory negligence would have been more pointed if it had been founded on the plaintiff's supposed knowledge of the fact that the cars were there, but no such instruction

was asked and doubtless the instructions as given af-
forded ground for argument covering that question.

Taking the instruction for the plaintiff in con-
nection with those for defendant we think the defense
of contributory negligence was fairly given to the
jury.

In the motion for new trial the defendant makes
the point that section 2876, Revised Statutes 1899,
which provides that no contract made by a railroad
company with its employee, limiting its liability for
damages under the statute, shall be valid, is uncon-
stitutional, but appellant makes no point of that kind
in its brief.

If any mistake has been made in the case it is
in verdict of the jury. We find no error in the rul-
ings of the court. The judgment is affirmed. All con-
cur. *Woodson, J.,* files separate concurring opinion.


## CONCURRING OPINION.

WOODSON, J.—I concur in all that is said by
my learned associate in his opinion, filed herein, except
as to that part which holds that probate courts have
no authority to appoint a guardian for persons who
have no property.

As regards that matter, I express no opinion; but,
in passing, I wish to suggest that it might be that
a right of action arising out of an injury to the person
which is a tort might be property within the meaning
of said section 3650, Revised Statutes 1899, even though
it was not unconstitutional.

In the case of Snyder v. Railroad Company, 86 Mo.
613, this court held that a right of action arising out
of a tort to property is assignable under our code.
If that be true, it strikes me that it is because the
damages done by the tort are property, otherwise it
seems to me it would not be assigned. The following

cases announce the same doctrine. [Snyder case, supra; Doering v. Kenamore, 86 Mo. 588; Chouteau v. Boughton, 100 Mo. 406; Connecticut Ins. Co. v. Smith, 117 Mo. 261.]

While it is true in the cases cited the damages done by the tortious act were an injury to property; but, query: After the tort has been committed and the injury has been inflicted upon the person, then is not the damage done thereby property within the ordinary meaning of that word? And might it not be assigned the same as a right of action growing out of a tortious injury to property, and justify the probate court in appointing him a guardian, as provided for by said section?

I do not say, but simply suggest that this might be a distinction between this question and the one involved in the case of Gilkeson v. Railroad Co., 222 Mo. 173. In that case it was contended by counsel for plaintiff, that the negligent killing of her husband was a violation of her property or property rights within the meaning of sections 96 and 97, Revised Statutes 1899. We there held that contention to be untenable. But that is not the question here presented. Here the question is, is the damage itself, which was done by reason of a tortious injury to the person, property within the ordinary meaning and common acceptation of that term? If not, then another query presents itself, namely: Could the probate court appoint an administrator of an estate where a party dies from the effects of a negligent act, leaving no property except the cause of action he would have had had he survived the injury? If not, then it might be contended by parity of reasoning that no administrator could be appointed to bring the suit provided for by the Act of 1905 (Laws 1905, p. 135), which transmits the cause of action therein mentioned to an administrator upon the happening of the contingencies therein stated.

In other words, are not the damages suggested in both cases mentioned property within the ordinary meaning of that word, and therefore warranting the appointment of a guardian and administrator, or can it be held that they are not property in either or both of said cases?

My official duties are so pressing, just at this time, that I have only time to suggest the above queries, but not sufficient time to properly investigate and express an opinion thereon.