## IN RÈ LAURA DOYLE.

### June 24, 1884.

1. HABEAS CORPUS — INFANTS — PRACTICE. — The court, in *habeas corpus* directed to a private individual to produce the body of an infant, is bound to release the infant from improper restraint.

2. —— In such a case the court is not bound to place the child in the custody of any particular person, but will exercise its discretion looking to the child's interest under all the circumstances.

3. —— In determining what the child's interests are, the court looks only to its temporal welfare, and disregards all question of religion as affecting its spiritual interests.

4. —— In *habeas corpus* the court can not appoint a guardian, but in making a temporary disposition of the child, if its temporal interests will be as well conserved by giving it in charge of a person of the religious faith of its parents, it will be so disposed of.

APPLICATION for *habeas corpus*.
*Custody of the infant given to the petitioner.*
A. J. P. GARESCHÉ, for the petitioner.
J. G. LODGE and J. A. TALTY, for the respondent.

BAKEWELL, J., delivered the opinion of the court.
This is an application under the *habeas corpus* act. The petitioner, Emily James, alleges that Laura Doyle, a child of eight years, is unlawfully restrained of her liberty by one William Conn. The name of the respondent is, however, George Conn. He brought the child into court in obedience to the writ. The testimony of witnesses for

petitioner and respondent was heard at great length. The facts appear to be substantially as follows : —

The petitioner is a Roman Catholic nun, and superior of an educational institution of the highest class, conducted in St. Louis by ladies of a religious order called Sisters of Loretto. The institution in question is a boarding-school for girls. The order, of which petitioner is a member, originated in Kentucky, and has houses in various parts of the United States. Its object is teaching. The sisters in Missouri are an incorporated body under our state laws. The petitioner, Emily James, is known in the order as " Sister M. Simeon." Though superior of the particular institution with which she is connected in St. Louis, she is not at the head of her order, but is herself a subject, and bound by her rules to obey the directions of her superiors, and liable to be ordered away from St. Louis as shall seem best to them.

George Conn, the respondent, is a master mechanic, aged thirty-nine years, earning about ninety dollars a month. He has been married about five years, and is childless. His wife's age is twenty-six. Their home is a modest but comfortable one, and such as might be expected from their position in life. Conn owns nothing beyond the furniture of his house. Both he and his wife have an excellent reputation amongst their neighbors as persons of the best habits. Mr. Conn is a Protestant; but not a member of any Protestant church. He has a general respect for religion ; and since his marriage, he and his wife have usually gone to church on Sunday evenings,— now to one Protestant church, and then to another. He is not specially prejudiced against the Catholic religion, and is anti-Catholic only so far as that is necessarily involved in the fact of his being a Protestant. Mrs. Conn was brought up a Catholic, but was married to Conn by an Episcopalian minister, and has not, since her marriage, attended the Catholic church. She still calls her-

self a Catholic, and says that, if dying, she would send for a Catholic priest.

The child Laura Doyle, the subject of the unhappy controversy, is a bright looking girl, apparently in good health. She was brought into court looking neat and well dressed; and her demeanor in the court-room during the proceedings showed that she was affectionately disposed towards Mr. and Mrs. Conn. We may say here, once for all, that there is no doubt that Mr. and Mrs. Conn and the child love each other dearly.

William Doyle, the father of Laura, is a molder by trade. His wife died nearly four years ago. They had four children: a married daughter, a boy now aged about eighteen, a girl aged now about twelve, and Laura aged now about eight. Doyle has the habit of indulging to excess in intoxicating liquors. He has for many years been in the habit of going on sprees. Between these periods of debauch he abstains from liquor altogether. When his wife died the family was broken up. The two girls at first were placed with their maternal aunt, Mrs. Kelly. But Mrs. Kelly's circumstances were such that it was inconvenient for her to keep the children, and the two little girls were placed by the father in the St. Bridget's Half Orphan Asylum in St. Louis. The father then went to work in another town. He was to pay four dollars a month to the asylum for each of the children; but after a few months he ceased to remit. Nor did he ever come to see his little girls. Twice he set out for St. Louis with considerable sums of money in his pocket, intending to do something towards their support, and on each occasion he got on a spree and lost his money. Doyle and all his family are Catholics. He himself has not attended to his religious duties for years; but he strongly desires that his children should be brought up Catholics, and it was with this view that he placed his children in a Catholic asylum. Two of Doyle's sisters are nuns of the Loretto order, and are in the same house with

Sister Simeon, the petitioner here. There is nothing to show that Doyle is a man of bad habits, except for his irresistible appetite for liquor, which leads to the occasional sprees of which we have spoken.

St. Bridget's Half Orphan Asylum is one of several asylums in St. Louis, in charge of Catholic nuns, supported partly by Catholic charity, and under the control, to some extent, of a board of gentlemen called the orphan's board. According to the rules of the board, children, when they leave the asylums, are to be placed only in Catholic families. When the children are of age to be of use, it is usual to place them in families, with the understanding that their position is not to be a menial one, but that of members of the families which receive them. It is the custom, before accepting any proposition from a family to receive an orphan, to have a certificate from the priest of the parish in which the family resides, that the heads of the family are practical Catholics.

In October, 1883, Mr. and Mrs. Conn conceived the idea of relieving their childless condition by adopting some child from an orphan asylum. Mrs. Kelly was a neighbor of Mrs. Conn, though they were not intimate. Mrs. Kelly was a Catholic; and to her Mrs. Conn applied for help in carrying out her project. Mrs. Kelly, accordingly, went with Mrs. Conn to various asylums. At St. Bridget's Half Orphan Asylum, they were shown two children, one of whom was Laura Doyle. Mrs. Conn was asked whether she was a Catholic, and said, either that she was, or that she had been raised, a Catholic. There can be no doubt that her answer was intended to convey the idea that she was a Catholic, and that it was so understood. She also said, in answer to a question by the sister in charge, that her husband was not a Catholic, but was not prejudiced against Catholics, and would not object to her raising the child a Catholic, and she promised, in case she was allowed to have Laura, that she would raise her a Catholic. Mr. Conn

afterwards saw the children, and he stated to the sister in charge that he was not a Catholic, but had no objection to the child being brought up a Catholic. The sister advised him not to take Laura, as she had relatives who might reclaim her. But both Mr. and Mrs. Conn preferred Laura; and, on statements of a similar character to those set out above, they obtained a letter to the asylum from a Roman Catholic clergyman, on the faith of which the child was delivered to them.

Mrs. Conn taught the child some prayers, — amongst others the " Hail Mary, " a Catholic and peculiarly un-Protestant prayer; but she gave her no catechetical instruction, never sent her to a Catholic Sunday-school and sent her daily to the public schools, when she was well enough to go, as she usually was. The child never went to a Catholic church, and once, at least, was sent to a Protestant Sunday-school. Mrs. Kelly heard of this, and remonstrated, urging upon Mrs. Conn her promises and those of her husband. Mrs. Conn replied that her husband had changed his mind, and would rear the child as he had been reared. Of all this, the aunts of Laura were informed. They took alarm, and the consequence was the present proceeding.

The father evidently doubted whether the custody of the child would be given to him on an application to the courts, so, after Mr. Conn had refused to give up the child to her aunts, he executed an agreement on the 7th of May, 1884. This agreement is a sealed instrument between himself and Sister Simeon, executed by both. It recites that Sister Simeon is a religious of the order of Loretto, that Doyle is the father of Laura, and unable to take care of her, that Laura's aunt, Catherine, is a member of the same order, and desires him to enter into the agreement, and in consideration of the premises and the stipulations of Sister Simeon, he surrenders to Sister Simeon his parental control over Laura, during Laura's minority, in consideration

of which, Sister Simeon covenants that she will assume the care and custody of Laura, feed, clothe, educate and maintain her during minority and, so long as Laura will submit to such control, reserving to Laura the right to choose her own guardian at fourteen.

Sister Simeon swore on the witness-stand, that she would carry out this agreement so far as she could; that she had not made it without the previous consent of her superiors, and that, under it, Laura would receive such an education in all respects as is given to the children of wealthy parents attending the Loretto school; that she would be put on an equality with these children, and taught all the usual accomplishments; that, at eighteen, she would be allowed to enter the community as a member of it, if she showed signs of a call to the religious life; that, if she had no such wish, she would then be able to maintain herself as a teacher, and would always have a home at the convent, if out of a place.

William Doyle swore that he desired the child to be placed under the charge of Sister Simeon, and desired in all respects to adhere to the agreement he had made.

Sister Simeon, who seems to be a woman of no ordinary intelligence, and of long experience of girls as a teacher, said that the effect of the separation between Laura and her new friends, the Conns, would probably cost her a pair of red eyes and a headache or two, but would not injure her health; and, as to this, she was corroborated by two of the best known and most respectable physicians of St. Louis.

Mr. Conn testified that the child seems to have a great horror and dislike of going back to St. Bridget's Orphan Asylum. But there is nothing to show that she would have any repugnance to go to Loretto Academy, except so far as she would dislike to leave Mr. and Mrs. Conn, who have been very good to her, and whom she strongly loves.

It is obvious that, whether the child is left with the Conns or placed in the Loretto Convent, her future is, to a certain extent, a precarious one. Mr. Conn, so far, has

accumulated nothing, and is dependent on his wages for support.   He and his wife may die, and they may also have children of their own in the course of nature.   On the other hand, Sister Simeon and the aunts of the children, now members of the Loretto order, may die, and all of them may be removed to other and distant fields of labor and duty.   It does not appear that the order, or the incorporated society of which Sister Simeon is a member, can adopt children.   Nothing of the kind is mentioned in the charter or contemplated in the purposes of the order; and, if the obligations assumed by Sister Simeon should be hereafter repudiated by her associates, it is obvious that they could not be legally enforced in any effectual way.

It is a general rule, applicable to cases of this kind that, in proceedings by *habeas corpus* directed to private persons to bring up infants, the court is strictly bound, *ex debito justitiæ*, to set the infant free from any improper restraint, but is not bound to deliver the child over to any particular person.   As to this, the court is vested with a discretion which it should exercise according to the circumstances of each case.   It is the benefit of the child that we are first to look at in any order that we may now make as to her disposition.   Any order that we might now make as to that would be in its nature temporary.   It would not be necessarily, or even naturally, final, however important it might by subsequent circumstances become.   The law provides for proceedings for the appointment of a guardian of an infant whose natural guardian can not or will not properly discharge his duties.   These proceedings are to be before the probate court, to which court such an appointment is delegated, and it is to that court, or, if the parent demands a jury, as he may do, to a jury to be impaneled in that court, that the law commits the duty of determining whether the father has become an unfit person to have the custody and control of his child.   *Ex parte Waldron*, 13 Johns. 417; *Cosmuth* v. *Addicks*, 5 Burn. 520; *Rex.* v. *Delarul*,

3 Burr. 1436 ; Schouler's Dom. Rel., sect. 248 ; Rev. Stats., chap. 37, sects. 2562, 2576.

We can not, in this proceeding, determine the question of guardianship ; and whether we shall alter the custody of this child is a matter that rests solely in our sound discretion, which, in such a matter, is not, in America, governed by any wooden rule as to the rights of the father, but is to be exercised on general principles of justice, after full consideration of all the circumstances, and with a view mainly to the child's interest, which we must look upon as altogether paramount to the claims of its father, who is not vested by law with any absolute right to its custody. *United States* v. *Gree*, 3 Mason, 383 ; 3 Hill, 399 ; 6 Rich. 244 ; 3 Ala. 736 ; 4 Ohio St. 615.

A great deal has been said in the argument as to the religious question.   In determining what will be best for the child, we can not, under the system of law which we are appointed to administer, look at that.   The state of which we are citizens and officers, does not regard herself as having any competency in spiritual matters.   She looks with equal eye upon all forms of a so-called Christianity, and subjects no one to any disability for rejecting Christianity in any form, nor for rejecting the generally accepted doctrines of natural religion.   A father in Missouri forfeits no rights to the custody and control of his child by being, or becoming, an atheist, nor are his rights in this respect increased before the law by his believing rightly.   The law does not profess to know what is a right belief.

The state of Missouri has, however, a law which forbids the appointment for an orphan, where another suitable person to act as guardian can be found, of a permanent guardian who is of a different religion from that of its last surviving parent.   Under this law no doubt, a baptised Catholic, or a Jewish child, might be given up to a guardian who rejected all forms of religious belief ; and must be so given up, if the last surviving parent died in the open pro-

fession of unbelief. The enactment is not made with any view to the eternal interests of the child in a future state of existence, but with a view to the rights and feelings of the parents. We consider that the state has thus a declared policy, which we ought to respect in a kindred case ; and that, although the case before us is not precisely that contemplated by the statute, since we are not appointing a statutory or permanent guardian, yet that, so far as the interests of the child are not injuriously affected, we ought to have some regard in disposing of this child to the religion of its parents and the wishes of its last surviving parent as to its religious education, and that the interests of the child itself require that we should have some regard to this.

It is manifest that anything which interferes with the natural right of the father to direct the religious education of his child strikes a blow at the family, which, in the last analysis, is the foundation of the state. Few men would be willing to assume the burdens of a legal paternity, if they supposed that their children could, against their will, be taken from them to be educated in religious systems which they. believed to be false, and to be taught thus to despise their father for his superstition, or for his infidelity, as the case might be. To the Protestant, the Catholic religion must be a system of superstition ; to the Jew, it must be one of imposture ; and, to the unbeliever, the old historic religions of the Jew and Catholic, and the various sects of Protestantism, are alike false, and the profession of any of them a confession, so far, of moral or intellectual weakness. I can conceive no more poignant anguish than that of the true father who sees his child, against his will, brought up before his eyes in a religious system which he abhors, as being, according to his belief, injurious to the spiritual interests of his child ; and, if he believes sincerely in any form of religion, his anguish at seeing his child brought up in religious indifferentism can not be less.

To this cry of parental affection it might be our duty, in

administering the laws of this state, to be altogether deaf, if it should clearly appear that we should be disregarding the best temporal interests of the child in hearkening to it. But, if the temporal interests of the child will be as well conserved by delivering it to the custody of those of its father's faith, we consider that in doing so, we are following out the policy of the law as declared by the statute before referred to.

The child is not at an age when impressions made are deep and permanent. If we refuse this application, she may remain long in the custody of persons who, however moral and attached to her, and capable of supporting her comfortably according to her state of life, are confessedly indifferent in matters of religious belief, one of them regarding all religions as very much alike, and the other having so weak a belief in the form of Christianity in which she was educated that she received what is regarded by the believers in that creed as a sacrament, at the hands, or (if he is not to be regarded as the minister of it), at least in the official presence, as a minister of religion, of a clergyman of a hostile religious body, and has for years abandoned all outward profession of her belief, and all attendance upon its services, and all use of the ministrations of her church, and habitually attended other services.

Beyond teaching her a short prayer or two, the child received no religious instruction from Mrs. Conn. She has been permitted to go to receive religious instruction in the Sunday-school of a religious body which is not that to which her father belongs. There can be no reasonable security felt that this state of things may not continue, and every hour that she remains with these kind people must necessarily deepen her attachment to them, and make the separation more painful, should a guardian be appointed, according to law, of her father's religion. Such a guardian, upon his appointment, would probably remove her from them.

For myself, I incline to think that, in one point of view, it might be better for the little girl that she should be brought up in the house of a decent, honest mechanic, according to her state of life, than that she should go to a boarding-school to learn (in addition, of course, to those useful and necessary things which will be thoroughly taught her there), a lot of frivolous accomplishments such as often unfit our young women for the sober duties that they must perform as wives, and which, in many cases, are entirely unsuited to the state of life in which they come into the world, and in which they are to be established in it. But, on the other hand, she will be with her kindred, will be taught the religion of her kindred, and, so far, will be in her natural position. If, by the form of her education, she is to be somewhat elevated above this position, it will commonly be thought that this is a positive advantage; and it can not be denied that, so far as the accomplishments which she will learn at the convent will furnish her with a means of making an independent living when she leaves it, they will be a great advantage. As to this, there is testimony that they will furnish her with such a means of subsistence. Such, at least, is the opinion of Sister Simeon, who has exceptional opportunities of judging as to that. It can not be doubted that the child will have at the Loretto Academy the kindest and most careful moral training; and if she, remains there long enough, we must believe that, if she proves an apt and diligent scholar, she may be taught there what perhaps she can maintain herself by teaching in her turn, when her education is accomplished. It would be a temporal disadvantage to her to be brought up in a religion which would tend to separate her from those of her own blood, who, on both the father's and the mother's side, are all Catholics — and Irish Catholics — that is to say, Catholics of the very strongest hereditary faith.

That the child has become attached to those with whom she has been for the past nine months, and that their heart-

strings will be wrung when she is lost to them, is matter
for consideration, and might be a very important element
in deciding this case were it apparent that the separation
would make her permanently unhappy or injure her health,
or if the father had voluntarily placed her with them, or
consented to her being there.   But, the evidence is, that
the separation will not injure the child's health, and expe-
rience teaches us that such sorrows, at the tender age of
this child, soon pass away.   The old love of childhood
readily yields to the new.   As to the second point, the
father placed the child in a Catholic institution from which
she was removed without his consent.   And she was deliv-
ered to her present custodians on a misapprehension of the
facts, for which we can not but regard Mrs. Conn as, to a
great degree, responsible.   We do not believe that Mr.
Conn made any intentionally false representations, and will
now say that the impression made upon us by his demeanor
on the witness-stand was in the highest degree favorable to
him.   He impressed us as a candid, honest, straight-
forward, intelligent man — one to make a model father.
We say this because we think that he was treated with
unwarranted harshness during the proceedings by counsel
for the petitioner.   We think that he was in no degree
impeached in his statements, and that the repeated declar-
ations of counsel for petitioner that he would be shown to
have perjured himself, were not borne out by any evidence
in the case.   Any apparent contradictions in his statements
were of that character which, to the experienced and care-
ful lawyer, tend to show, not that the witness lies, but
that he is telling the truth to the best of his ability and
recollection, and not swearing to a previously prepared
tale.

The father has not, by his agreement with Sister Simeon,
parted, and in our opinion he could not by any such agree-
ment, wholly part, with his rights as a father.   It is he,
through her, that is endeavoring to replace the child in a

condition as to her religious education similar to that in which he originally placed her. He desires that she should be placed with Sister Simeon as her teacher; and we see no sufficient reason why no respect whatever should be paid to his wishes in this matter. So far as these are not inconsistent with the interest of the child, we think we ought to regard them. We can not agree with counsel for respondent that the father is shown to have emancipated the child. He has, owing to his unhappy passion for strong drink, violated his duty as a father, whether he has shown himself wholly unfit to have any control of her, we are not now to decide. That question may come up upon application to remove him and appoint a guardian; but any such application must be made in the probate court, and the father will then be entitled to a jury to pass upon the question of his unfitness to have custody of his child. Meanwhile, we are not asked to remit the child to its father, but to deliver her up, until some further steps are taken by her friends, to the charge of an eminently experienced superior of an excellent boarding-school for girls, who is of her own religion, and of the religion of both her parents, and, so far as it appears, of all her relatives, and whom the father designates as the person whom he desires to assume control of the child, at least for the time being. We have in view the fact that, should the father be found, in the proper proceeding, unfit to have control of the girl, a guardian of his religion, must, if a suitable person be found, be appointed under the statute, and the removal from her present surroundings, which would then probably occur, would be more painful both to respondents and to the child, and more likely to prove injurious to the child, than a change now made.

We have carefully considered the brief of respondent's counsel, and, if we do not refer to it in a more particular manner, this is only because it has already been found necessary to extend this opinion to great length in the statement of the grounds and reasons of our judgment. The case

before us has a peculiar feature owing to the provision of the Missouri statute to which we have before referred.

After giving to this case the most careful consideration, and allowing, as we think, due weight to everything in the way of evidence, argument, or authority that has been laid before us, we have arrived at the conclusion that we shall best consult the interests of the child by remitting her now to the custody of Sister Simeon, in accordance with the wishes of her only surviving parent, which wishes we have felt that we had, under the circumstances, to regard in some degree in arriving at this determination.

Immediately before this application to us, a similar application had been made to the circuit court. Judge Thayer, on that hearing, felt it to be his duty to remand the child to the custody of Mr. Conn. This action of that very able, dispassionate, and learned judge has had its weight with us, and we have read with care the written memorandum of the grounds of his judgment that he handed down on remanding the child, and have also examined the cases to which he there refers, and the effect of which he apprehends precisely as we ourselves do. We do not know what evidence was introduced before Judge Thayer, and this, of course, is entirely an independent proceeding, and one in which we by no means review his action.

We think that the child should be taken from the custody of the respondent and delivered to that of the petitioner. It is so ordered. Judge Thompson did not sit. Judge Lewis concurs.