## BENJAMIN R. BREWER, Appellant, v. WADE CARY, Respondent.

St. Louis Court of Appeals. Argued and Submitted April 4, 1910. Opinion Filed April 19, 1910.

1. **GUARDIAN AND WARD: Removal of Guardian: Probate Courts: Exclusive Jurisdiction.** Under the provisions of sections 3480, 3481 and 3482, Revised Statutes 1899, and section 34, article 6 of the Constitution, the power of appointment and removal of guardians and curators of minors is vested solely in the probate court.

2. **JURISDICTION: Exclusive Jurisdiction: Courts.** Where the Constitution and statutes have by specific provisions conferred jurisdiction in particular matters on certain designated courts, thus clearly indicating that such jurisdiction is in those courts exclusively, it is not within the power of any other court, whether of law or equity, to assume such jurisdiction.

3. **EQUITY: Deals Only With Question Affecting Property.** Equity is concerned only with questions affecting property, and it exercises no jurisdiction of wrongs to the person or to political rights, or because the act complained of is merely criminal or illegal.

4. **GUARDIAN AND WARD: Powers of Guardian: Education and Religious Training of Ward.** The determination of matters of education of the ward, both secular and religious, is committed to the guardian, natural or appointed.

5. ———: ———: ———: **Statutes.** The state does interfere, however, by requiring, under section 3494, Revised Statutes 1899, that the guardian appointed by the probate court shall not be "a person of religious persuasion, different from that of the parent, or of the surviving parent of the minor, if another suitable person can be procured, unless the minor, being of proper age, should so choose," which amounts to a legislative declaration that the religious as well as the secular education of the minor is to be committed to the person who is appointed guardian.

6. **INFANTS: Habeas Corpus: Welfare of Child.** In a proceeding by habeas corpus for the custody of a child, the welfare of the child itself invariably determines the matter, and not the naked question of right of custody in either parent or in the appointed guardian.

148 App—13

7. ————: ————: ————: **Powers of Court: Removal of Guardian.**
In cases arising under the Habeas Corpus Act, the court, having
regard to the welfare of the child, will remit or commit its
custody to one or the other of the parties before it in that pro-
ceeding, but it will not attempt to appoint or remove a guardian
or curator, or a parent from the guardianship of the child, leav-
ing that to the probate court; nor will it direct the guardian as
to matters of teaching or training of the ward.

8. **GUARDIAN AND WARD: Unfitness of Guardian: Removal.**
If the guardian, or even the parent, is an unfit person, the rem-
edy provided by statute is to institute proceedings in the pro-
bate court for his removal.

9. ————: **Removal of Guardian: Directing Religious Training of
Ward: Circuit Courts Have no Such Jurisdiction.** The circuit
court on its equity side has no jurisdiction to remove a father as
natural guardian because of a breach of an ante-nuptial contract
providing that the offspring should be brought up in the Catho-
lic Faith, nor to direct the father, as natural guardian, to bring
up the offspring of said union in that faith, since the probate
court has exclusive original jurisdiction in all matters relating
to the appointment and removal of guardians of children.

10. **INFANTS: Suits by: Necessity of Appointing Next Friend: Par-
ties.** Where an ante-nuptial contract provided that the father
would bring up the children of the union in the Catholic Faith
even if the wife should die, at the death of the wife, her father
who was not appointed as a next friend under sections 550, 551,
and 553, Revised Statutes 1899, had no standing to seek to com-
pel performance of the contract in behalf of the infant chil-
dren of the union, who were under fourteen years of age, since
the statutes provide the only way in which an infant can sue.

11. **HUSBAND AND WIFE: Ante-nuptial Contract for Religious
Training of Children: Not Property Right.** Under an ante-
nuptial contract providing that the wife would have the right
to bring up the offspring in the Catholic Faith, the right of the
wife is not a property right that would pass to and be enforce-
able by her personal representative at her death.

12. **PARTIES: Capacity to Sue: Properly Raised by Demurrer:
Pleading.** The objections that a plaintiff, suing as next friend
of infants, was not appointed by the court as provided by
statute is not waived by not making a special appearance,
where the petition was demurred to on that ground.

13. **HUSBAND AND WIFE: Ante-nuptial Contract for Religious
Training of Children: Not Property Right: Specific Perform-
ance.** An ante-nuptial contract, providing that the children

should be brought up in the Catholic Faith, even if the wife should die, cannot, after her death, be specifically enforced, since no property rights are involved.

14. ———: ———: **Public Policy: Specific Performance.** An ante-nuptial contract, providing that the offspring should be brought up in the Catholic Faith, even if the wife should die, is not, after her death, an enforceable contract against the husband, since public policy forbids the permanent transfer of the natural rights of a parent.

15. ———: ———: **Moral Duty: Specific Performance.** An ante-nuptial contract, providing that the offspring should be brought up in the Catholic Faith, even if the wife should die, cannot be specifically enforced, since only a moral duty is involved, which is not a ground of equitable jurisdiction.

16. ———: ———: **Welfare of Child: Specific Performance.** An ante-nuptial contract, providing the offspring should be brought up in the Catholic Faith, even if the wife should die, is not enforceable in equity on the ground that the court would look to the welfare of the child, since that would result in determining between religions, which the court will not do.

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds,* Judge.

AFFIRMED.

*Benjamin R. Brewer, Gardner & Morgan* for appellant; *John L. Carley, J. F. Conran* and *James M. Dohan* of counsel.

(1) The foundation of a republic is the virtue of its citizens. Marshall v. Railroad, 16 How. 314; Trist L. C., 214, Hughes' Datum Posts, p. 102; Oakley v. Davies, 58 Tex. 141; cases stated in Newcomb. (2) National morality depends upon religion. Washington's Farewell Address; State v. Williams, 26 Howell's State Trials 654; Church v. United States, 143 U. S. 457, and numerous cases cited; State v. Ambs, 20 Mo. 214; St. Joseph v. Elliott, 47 Mo. App. 422. (3) Marriage is the highest consideration known to the law either to raise a use, found a contract, gift or grant. Norwack v. Beyer, 133 Mo. 24; Coke on Littleton, 96; Johnston

v. Dillon, 1 Bay 232; 4 Kent's Com. 465; 1 Bishop Mar. Wom., sec. 27775; Ford v. Stewart, 15 Rev. 499; Greene v. Cramer, 2 Con. & Law 60; Fraser v. Thompson, 1 Giff. 62; Holder v. Dickson, Freeman, 96; Smith, Hof. 216a; ·Waters v. Howard, 8 Gil. 262; Barron de Biel, 12 Ch. & Fin. 45, 78, 79; Nowack v. Berger, 133 Mo. 39; 29 Cyc., p. 1592, 20 Am. Dec. 324; State v. Broton, 15 Am. L. Rep. (N. S.) 359; Lamar v. Harrisll, 117 Ga. 993; Miller v. Miller, 123 La. 165; State v. Barnett, 45 N. H. 15; Fitzgerald v. Fitzgerald, 24 Hun 370; Clark v. Boyer, 32 Ohio St. 299. (4) That the filing of this proceeding to effect the personal rights of the infants is a proper subject of chancery jurisdiction. 22 Cyc., p. 520; Cole v. Gorley, 79 N. Y. 527, 9 Hun 493; Isaacs v. Boyd, 5 Port. (Ala.) 388. (5) The exigencies of each case as to the bringing of the suit rests upon its own facts, and a court of chancery will make such order regarding the same as it deems proper. 1 Beach on Modern Equity, p. 55; 22 Cyc., p. 640; In re Mitchell R. M. Corlett 489; In re Browns, 117 Ill. App. 332; Colter v. Cypert, 78 Ark. 193; Reeves Dom. Rel. 315; Rhodes v. Rhodes, 43 Ill. 339; Loyd v. Mallone, 23 Ill. 43.

*Wilfley, McIntyre & Nardin* for respondent.

(1) Over that part of the petition asking for the appointment of a guardian the court had no jurisdiction. Sec. 3480, R. S. 1899. (2) Plaintiff, not having been appointed next friend by any order of court, had no standing in court and no right to bring suit for minor children. Secs. 550, 551, 552, 553, R. S. 1899. (3) Courts of equity will not enforce agreements or take cognizance of rights unless some property right is involved. They do not undertake to enforce mere moral or religious obligations. Bispham's Principles of Equity (8 Ed.), p. 58, and cases cited. (4) An agreement or promise of a father in regard to the religious training or education of his children will not be enforced against him in the courts. Agar-Ellis v. Las-

celles, 10, Chanc. Div. 49, Law Rep. 1878, 1879, 42 Victoria; Andrews v. Salt, Law Rep. 8, Chancery 626; In the matter of Laura Doyle, 16 Mo. App. 159; In the matter of Bernice Scarritt, 76 Mo. App. 567; Weir v. Marley, 99 Mo. 484.

STATEMENT.—The plaintiff in this case has brought this as a suit in equity, praying the circuit court, in which court it was instituted, "to make its order of record" requiring and directing the defendant to permit an infant some three months old to be baptized under the forms of the Roman Catholic Church and to allow an older child, between three and four years of age, to go to that church and to attend services thereat and to be instructed in the faith of its mother, to the end that the defendant be compelled to keep and perform an agreement, entered into between defendant and his former wife at the time of contracting the marriage between them. The agreement as set out in the petition is as follows:

"I, the undersigned, Wade Cary, not a member of the Roman Catholic Church, wishing to contract marriage with Miss Gertrude A. Brewer, a member of the Roman Catholic Church, propose to do so with the understanding that the marriage bond thus contracted is indissoluble except by death; and I promise that she shall be permitted the free exercise of religion according to the Roman Catholic Faith, and that all children of either sex, born of this marriage, shall be baptized and educated in the Faith and according to the teaching of the Roman Catholic Church, even if she should happen to be taken away by death."

It is averred in the petition that this agreement was voluntarily entered into by defendant, and was made in accordance with and pursuant to the laws of the Roman Catholic Church and was signed and executed by the defendant, ".with full knowledge that the marriage could not take place without that. The agree-

ment was taken and accepted by the parties named therein at the time, and by the minister of the church, who thereupon performed the marriage rite."

It is further set out in the petition, that the plaintiff brings this suit in behalf of the infant children who were born of the marriage between the parties to the aforesaid agreement, "as in the capacity of next friend, for them, because they are helpless to sue for themselves and suffer great wrongs at the hands of their guardian, the defendant herein, and they are now without redress or relief; that said defendant being the natural guardian of said children, it has become necessary that your petitioner bring this action, on their behalf, moved by motives of bounden duty, and affection, arising out of the relation by blood that petitioner sustains to said children, for whose sole benefit he brings this action, and prays the court, in the exercise of its just powers, to permit him to prosecute this suit, for the reason stated and hereafter to be stated; as well also, for the reason that petitioner was godfather to one of the children, . . . at the time it received the sacrament of baptism, which was also by the consent, and at the request of the defendant, and according to the rites of the Catholic Church, and because, by virtue of the rules and usages of the church, it is now obligatory upon petitioner, as such godfather, so acting as aforesaid, at the instance and request of defendant, to see that the child receives religious instruction in the faith of the Catholic Church, and to use all reasonable and lawful means to that end; for these reasons, and the desire to make secure, as far as he can, the welfare of the children, now, and in the future, it has become, as aforesaid, the duty of this petitioner to institute this action, in order that the defendant shall be required and caused to keep and perform his agreement hereinafter set forth."

He further states that he is the grandfather of the children, who are children of his deceased daughter, who was the wife of the defendant; that their mother died

June 23, 1908, in the faith of the Roman Catholic Church, and left the two children born of the marriage aforesaid with the defendant, and that both of them are now living and under the control of the defendant in the city of St. Louis. It is then averred in the petition, "that the defendant is guilty of unlawful oppression of the children, in his capacity over them, and his treatment of the children violates the agreement hereinafter set forth."

The petitioner further avers that he appeals to the court in its capacity as a court of equity and of conscience, "in behalf, and in furtherance of the children's just rights, which are of the highest importance to them, in human affairs; and in order, to keep them from sin, evil and harm, and to prevent the evil, that may hereafter come upon them, and be suffered in the future by them, by reason of the failure of the defendant to keep and fulfill his obligation, under the terms of said agreement."

The petition contains the further averment that the defendant, for the consideration of entering into the bond of marriage aforesaid, "is now thereby estopped and cannot rightfully exercise the privilege of preventing, at his will, as he is now doing, said children from having the benefits which that agreement was intended to secure to them; that it is a grave wrong, legally and morally, for him to do so, and is great injustice to the children, and is a fraud upon their most sacred rights to deprive them of the benefits of that agreement, which inures to them; that their injury is irreparable; that they are without remedy, save by a court of equity; that defendant without any hardship, or difficulty, or expense to him, could and can now, fulfill said agreement." The agreement is then set out as before noted.

It is further set out that by the laws of this State, minor children of the tender age of these children shall not be committed to the guardianship of a person of religious persuasion different from that of their parents

and that inasmuch as the mother of the children was of the Roman Catholic Church and is now dead and that the defendant is not of that faith, he never having been baptized, that the children ought not to be subjected to his guardianship while he disregards that agreement in so far as their religious training is concerned, and that by reason of the agreement the defendant divested himself of the privilege he now claims and is now shorn of the personal privilege of a surviving parent that he would have had in the absence of the terms and the considerations of the agreement. It is charged that the defendant has wilfully refused and now still refuses and threatens and intends hereafter to refuse to permit the younger child to be baptized and also refused and intends and threatens to refuse to permit the other one to be taught in the faith aforesaid. The plaintiff prays that the older child "be considered a ward of this court;" that she is a Catholic, is entitled to have and enjoy its religious rights and privileges as a Catholic child, and that the defendant restrains her and will not allow her the constitutional and lawful right of that faith and persists in a course of conduct calculated to deprive her and in fact does deprive her of the lawful and constitutional rights that belong to her, and the right to have a guardian of the faith of her deceased mother to which she is entitled; that defendant keeps her from church and from all her relatives who are of that faith and that his conduct is injurious and demoralizing to her and violates her rights under the law of the land; "that his willful disregard and violation of the antenuptial agreement, and his acts and doings, aforesaid, is a species of fraud and falsehood repugnant to the law and against the sound principles of morality." It is further stated that the younger child is of sufficient age and for several months has been old enough to receive baptism in accordance with the agreement, and that the older one is now of sufficient age and capable of being taught in the faith referred to; that the defendant has

remarried and his wife, the stepmother of these children, is not of the faith of their mother, and, finally, it is averred that the children are in great danger of being deprived of their inherent rights aforesaid unless by the intervention of the court, the course and conduct of the defendant toward the children be checked "to prevent their loss and their ruin." It is averred that the defendant's disregard and repudiation of the solemn obligation aforesaid, "is a wrong, grave, palpable and deliberate, and is without justification or excuse." The prayer for relief is as before stated.

A demurrer was filed to this petition in which three grounds were stated: First, that the court has no juris-plaintiff has no legal capacity to sue; and third, that the plaintiff has no legal capacity to sue, and third, that the petition does not state facts sufficient to constitute a cause of action. This was sustained. Plaintiff declining to plead further, judgment went for the defendant from which plaintiff has duly perfected an appeal to this court.

REYNOLDS, P. J. (after stating the facts).—At the threshold of the case we are confronted with the propositions that the circuit court has no jurisdiction over the appointment of a guardian of children, and that the plaintiff, not having been appointed next friend by any order of court, had no standing in court and no right to bring suit for the minor children.

First. If this is to be considered a case for the removal of the defendant as surviving parent and natural guardian of the children, the case cannot stand, for we have a statute that must govern. Our statute, sections 3480, 3481 and 3482, Revised Statutes 1899, provides for the appointment and removal of guardians. Section 3480 provides that if a minor have no parent living, or the parents be adjudged incompetent or unfit for the duties of guardianship, the probate court, or judge or clerk thereof in vacation, subject to the confirmation or

rejection of the court of the county of the minor's domicile, shall appoint guardians to such minors under the age of fourteen years and admit those above that age to choose guardians for themselves, subject to the approval of the court at its next term thereafter, and it is further provided by that section, that any question as to the "unfitness or incompetency of parents, after ten days' notice to the parents, shall be decided in the probate court by the judge thereof, or by a jury, if one be demanded." Section 3481 provides that the probate court and judges thereof may appoint guardians and curators of minors who are deaf and dumb, and who are over the age of fourteen years, and that the probate court may appoint a guardian or curator of the person or estate of any minor whose father may be imprisoned in the penitentiary of this State, the appointment only to last while the father is in prison and shall not deprive the mother of her rights to the custody of her children. Section 3482 provides that the lawful parent of any minor, not having been adjudged unfit for the duties of the guardianship of such minor, may, when the other lawful parent is dead, "and only in such case, by will, appoint a guardian of the person of such minor."

Section 3494 provides: "A minor shall not be permitted to the guardianship of a person of religious persuasion different from that of the parents, or of the surviving parent of the minor, if another suitable person can be procured, unless the minor, being of proper age, should so choose."

These are all the provisions of our statute material to be considered relative to the appointment and removal of guardians and curators of minors and it is to be observed that the power for appointment and removal is vested solely in the probate court. Moreover, section 34, article VI, of our Constitution, providing for the establishment of probate courts, ordains that those courts shall have jurisdiction over all matters pertaining to the appointment of guardians and curators of minors.

Construing this provision, our Supreme Court, in Hoffman v. Hoffman's Executor, 126 Mo. 486, l. c. 493, 29 S. W. 603, held that in matters within their constitutional jurisdiction the probate courts have exclusive original jurisdiction to the exclusion even of courts of equity. See also Titterington, Admr., v. Hooker et al., 58 Mo. 593; Pearce v. Calhoun, 59 Mo. 271, and Redmond v. Quincy, O. & K. C. R. Co., 225 Mo. 721, 126 S. W. 159.

It is distinctly announced in the case of DeJarnett v. Harper, 45 Mo. App. 415, at page 421, that "the incompetency or unfitness of the mother for the duties of the guardianship can only be tried and determined by the probate court of the county where such mother is domiciled, and this, too, after ten days' notice to such mother. The statute has provided in specific terms how and by whom this question of unfitness shall be tried and adjudged, and no other court or tribunal can assume to act in the premises." Section 5281, Revised Statutes 1889, now section 3480, Revised Statutes 1899, is cited in support of this. The authority of this case of DeJarnett v. Harper has never, so far as we are aware, been questioned. It is true that the point in decision ·was as to which of two probate courts—considered as between them—was entitled to make the appointment. But it is controlling by way of argument, on the proposition that jurisdiction is lodged in the probate courts alone. Original jurisdiction to appoint or remove a guardian of the person or curator of the estate being lodged in the probate courts alone, no original power to do either is lodged in the circuit courts. Broad and extensive as are the powers of a court of equity, when our Constitution and statute have by specific provisions conferred jurisdiction in particular matters on certain designated courts, thus clearly indicating that such jurisdiction is exclusively in those courts, it is beyond the power of any other court, whether of law or equity, to assume a jurisdiction expressly conferred by statute

upon other tribunals. In this matter of jurisdiction our system is radically different from that of Great Britain.

Referring to Pomeroy on Equity Jurisprudence, probably the most voluminous and exhaustive work on that subject, it is said at section 78, vol. 1 (3 Ed.), that whenever an infant succeeds to property the English chancery takes the management of his person and his estate and a proper suit having been commenced the court appoints a guardian in the absence of a testamentary appointment, and the infant is thereafter a "ward of the court," under its actual paternal care; that in some of the states the courts possessing full equitable jurisdiction have theoretically the power to appoint a guardian but that even if this power is exercised the court does not make the infant its ward and extend a personal oversight over him but that in this matter, where the Legislature has intervened and the jurisdiction is vested in the probate courts, these probate courts "practically appoint all guardians, and control their official actions. Under their general power in cases of trust and of accounting, the American courts of equity may give all proper relief to wards against their guardians; but the peculiar jurisdiction over the persons and estates of infants possessed by the English chancery does not, to any extent, exist in the American equity jurisprudence." This latter declaration, that the jurisdiction over the persons and estates of infants possessed by the English chancery does not, to any extent, exist in American equity jurisprudence, is in line with the rule of equity universally recognized in this country that "equity is concerned only with questions which affect property, and it exercises no jurisdiction in matters of wrongs to the person or to political rights, or because the act complained of is merely criminal or illegal." [Bispham's Equity (6 Ed.), p. 57.] Mr. Pomeroy further treating of the control of courts of equity over infants, says (vol. 3, secs. 1303 and following), that while in England this particular jurisdiction is one of the most

important branches of equity jurisprudence, in this
country, by reason of statutory legislation, it is rela-
tively of much less importance; that in England, in or-
der that the jurisdiction may be acquired in any par-
ticular case, the infant must be made a "ward of the
court," and that when the court appoints a guardian,
which is ordinarily the first step taken, the future con-
trol of the infant's person and property is usually exer-
cised upon and through this guardian, and that in ad-
dition to the power to appoint guardians, a court of
equity will also exercise its jurisdiction in a proper case,
and to permit the highest welfare of the infant; where
there is already a guardian, natural or legal, it will do
so by controlling the person of the infant and by remov-
ing the infant from its natural or legal guardian, even
from the custody of its own parents. It may do that
only in case the habits, practices, instruction or exam-
ple of the parents exerting a personal influence on the
infants, tend to corrupt their morals and undermine
their principles, or when the parent is neglecting their
education suitable to their condition in life, or is endan-
gering their property or is guilty of cruelty toward
them.    Under like circumstances it will remove infants
from the custody of a legally appointed guardian. Hav-
ing appointed a guardian for a "ward of the court," the
supervision and control is ordinarily exercised by super-
vising, directing and controlling the acts of the guardian,
and that guardian may be supervised and directed in
the conduct: First, of the intellectual, moral and religious
training of the ward; second, the protection and manage-
ment of his property, including his maintenance, and
third, his marriage, and that while the education of the
ward will be directed by the court to be that suitable to
his prospects and condition in life, "the manner and
course of the education and of its details are left to the
judgment and discretion of the guardian, and the ward
will be compelled to comply with his guardian's decis-
ion. The English courts exercise some supervision over

the religious training of the ward, acting upon the general rule that the ward should be brought up in the religious beliefs, opinions and practices of his father. This general rule is subject to modification, however, under the particular circumstances of individual cases."

It will be seen from this that even under the English rule, the appointment of a guardian, or leaving the infant in the care of its parent, commits to the natural or appointed guardian the determination of matters of education, both secular and religious, as well as the proper maintenance of the ward. In most of our American states and certainly in this State, these matters are all committed to the guardian, natural or appointed, and are under control of the probate courts. The state does interfere, however, by the requirement that the guardian appointed by the probate court (section 3494) shall not be "a person of religious persuasion different from that of the parents, *or of the surviving parent of the minor,* if another suitable person can be procured, unless the minor, being of proper age, should so choose. This amounts to a legislative declaration that the religious, as well as the secular, education of the minor is to be committed to the person who is appointed guardian. The only way, therefore, under our law, to remove a person so appointed guardian or to take the care of the child from the surviving parent, in case that parent or the parents are adjudged incompetent or unfit for the duties of guardianship, or the guardian is not of the religion of the surviving parent, is by proper proceeding in the probate court. The fact of disqualification being found, the probate court has power to appoint a suitable guardian. That guardian must be of the faith of the *surviving parent.* We are not here referring to cases which have arisen in our courts and in other jurisdictions, where, under the writ of habeas corpus, and in a conflict over the right of control of the minor, our courts, not as courts of equity, but as common law courts, and proceeding under the power of such courts lodged in

them to issue, hear and determine writs of habeas corpus, determined the question of custody. That, in such cases, is determined, not on the naked question of right of custody in either parent, or of the appointed guardian, but invariably on the determination of the question which our courts hold to be paramount to all others, namely, the welfare of the child itself. Such are the Doyle Case, 16 Mo. App. 159; In re Scarritt, 76 Mo. 565, and Weir v. Marley, 99 Mo. 484, 12 S. W. 798. These are leading cases on this question in our jurisdiction. United States v. Green, 3 Mason 482; People v. Mercein, 3 Hill (N. Y.) 399; In re Waldron, 13 Johnson 417; Ex parte Schumpert, 6 Rich. (S. C.) 344; Gishwiler v. Dodez, 4 Ohio St. 615 are leading cases in other American courts. In the English courts the case of In re Scanlan, L. R. 40, Ch. D. 200 (1889); Andrews v. Salt, 8 Ch. App. 622 (1873), s. c. L. R. 10 Ch. Div. 49; and In re Nevin, 2 Ch. L. R. (1891) 299 are well known and often cited with approval by our own courts. While the older English cases inflexibly carried out the wishes of the father, recognizing his authority as supreme, even to the extreme of taking the infant from the virtuous mother and committing it to the care and custody of a dissolute father living in adultery, the English conscience, shocked at the hardship of such a rule, found voice in an act of Parliament, in what is called "Justice Talfourd's Act" (2 and 3 Vict., chap. 54), which practically overturned the rule. "This act proceeds upon three grounds," says Schouler on Domestic Relations (5 Ed.), sec. 247, "First, it assumes and proceeds upon the existence of the paternal right. Secondly, it connects the paternal right with the marital duty and imposes the marital duty as the condition of recognizing the paternal right. Thirdly, the act regards the interest of the child." Under a later act (36 and 37 Vict., chap. 12), it is provided that the surrounding circumstances of a case will be more sedulously regarded, even against a father's own application for custody; paternal

right, the marital duty, and the interest of the child being all considered.

Primarily, however, by our own law as above quoted, and in cases involving the education, secular and religious, of the child, the control and direction is with the surviving parent, if one of them be dead, or in the guardian appointed by the court, it being assumed, and our law proceeding upon the assumption, that he to whom is committed the custody of the infant is the one to direct its training and education, and that if it is shown that he is not the proper party to be charged with this trust, he is to be removed from the trust. That action, however, originally and exclusively, is in the probate court and not in the circuit court. Even in the probate court the qualification is that the selected guardian is of the faith of the surviving parent, it being assumed that the person so selected will train up the child in that faith. Even in cases arising under habeas corpus proceedings, the court having regard to the welfare of the child will remit or commit its custody to one or the other of the parties before it in that proceeding, having regard to the welfare of the child, but it will not attempt in that proceeding, to appoint or remove a guardian or curator, or a parent, from the guardianship of the child, leaving that to the probate court. Nor will it direct the guardian as to any matters of teaching or training. In no case to which we have been referred by counsel, nor which our own research has disclosed, have we found any instance in this State, in which our circuit courts, acting as courts of equity, or as law courts proceeding under the writ of habeas corpus, have undertaken to exercise any such powers as here invoked. In no case have any of our courts directed a guardian remaining in control and custody of the ward, whether that guardian is the father, mother or one appointed by the court, as to what particular course of education or training, secular or religious, is to be pursued. The remedy by statute is, if the party acting as guardian or in the

place of the parent, or even the parent, is an unfit person, by proceeding instituted in the probate court. This goes to the very root of plaintiff's claim, even admitting that he has capacity to sue, if it be held that his present action seeks the removal of the defendant as guardian, or if he is attempting, as the prayer of his bill seems, to have the circuit court direct the father, as natural guardian and sole surviving parent to pursue a certain line of conduct toward the religious training of his children.

Second. The plaintiff in this case, as grandfather of both children and as godfather of one of them, has not, as such, under the law, a standing in court to maintain this suit. Our statute has made specific provisions for suits by and against infants. Sections 550 to 553, Revised Statutes 1899, cover this matter. Section 550 provides that suits by infants may be commenced and prosecuted either, first, by the guardian or curator of such infant, or, second, by next friend, appointed for him in such suit. Section 551 provides that the appointment of a next friend for an infant shall be made by the court in which the suit is intended to be brought or by a judge or clerk thereof. Section 552 provides that the appointment shall be made on petition in writing of the infant, if of the age of 14 years, and the writen consent of the person proposed to be next friend to such infant, acknowledged before and approved by the court or officer making the appointment. Section 553 provides that if the infant be under the age of fourteen years, the appointment of a next friend may be made upon a like petition of a relative or friend of the infant, in which case, a notice thereof must first be given to the person with whom such infant resides. If this contract is enforceable, it is clear that this plaintiff has no right under our law to enforce it. It is also clear that the right assumed to be conferred on the wife by the contract, to have the children brought up under and in accordance with the tenets of a particular religion, is not a prop-

erty right which would pass to and be enforceable by the executor or administrator of the deceased wife. If the contract was one which the courts would specifically enforce, it may be that the law would regard it as entered into by one person, in this case the mother, for the benefit of third parties, the children, and in such case enforceable at the suit of the children in affirmance of their right in accordance with the forms provided by the statute, supra, authorizing suits by infants through a next friend, duly appointed by the court. [Cress v. Blodgett, 64 Mo. 449.] Plaintiff has no such appointment.

It is said by the learned counsel for the appellant that by not making a special appearance, the defendant waived the objection that plaintiff had not been properly appointed as next friend. The only authority cited in support of this contention of waiver is that of Blair v. Henderson, 49 W. Va. 282. That decision was under a code different from ours. The point here made is founded on a misapprehension of our law. The petition was specifically demurred to on the ground that the plaintiff had no legal capacity to bring this suit. Our statute and decisions not only authorize but require this question of capacity to sue to be raised by demurrer, when the defect appears on the face of the petition, it being said in Jones v. Steele, 36 Mo. 324, and Rogers v. Marsh, 73 Mo. 64, that the waiver occurs only when there is a failure to demur. The second ground of demurrer in this case is distinctly based upon this defect of capacity or authority in plaintiff to sue. There are no averments in the petition, no allegations in it, that warrant us to depart from these requirements of the provisions of the statute before referred to and allow this plaintiff to maintain this suit.

Third. We might rest our decision on the above propositions, but for the fact that counsel have made a very strong appeal and able argument in support of the merits of the case, resting their contention of the en-

forceability of the ante-nuptial agreement between the defendant and his deceased wife. We will therefore briefly notice that contention.

It is hardly necessary to observe that courts of equity have power to decree specific performance of contracts. That, however, as already noted, is a jurisdiction to be exercised in matters affecting property, and property rights. Even in the English chancery courts, when they assume jurisdiction of an infant and make the infant a ward in chancery, it is always on the assumption, sometimes a mere fiction, that the infant ward has property interests, the protection or enforcement of which requires the intervention of the chancellor. [Pomeroy, supra.] Here there is no pretense of any property right being involved and we might dispose of the case on that ground. But passing that, it surely cannot be pretended that equity can deal with any but enforceable contracts. We are therefore, in order to give plaintiff any standing whatever in a court of equity, to determine whether the contract he seeks to have the court compel defendant to observe—which he seeks to have specifically enforced—is an enforceable contract. Schouler, in his work on Domestic Relations (5 Ed.), an accepted authority frequently recognized by our courts, treating of such agreements, says (sec. 251) : "The general doctrine appears to us, on the whole, to be this: That public policy is against the permanent transfer of the natural rights of a parent; and that such contracts are not to be specifically enforced, unless in the admitted exception of master and apprentice, to constitute which relation requires, both in England and America, certain formalities; and excepting, too, in parts of the United States where the principles of legal adoption are part of the public policy."

At common law the father cannot divest himself, even by contract with the mother, whether made before or after marriage, of the custody of his children. [Schouler, Domestic Relations (5 Ed.), p. 396, sec. 253.]

In Andrews v. Salt, supra, where there was an an-te-nuptial agreement between the parties about to marry, that boys born of the marriage should be educated and brought up in the religion of the father, who was a Ro-man Catholic, and that the girls should be brought up in the religion of the mother, who was a member of the Church of England, Lord Justice MELLISH, who deliv-ered the judgment of the Court of Appeals in Chancery, said (l. c. 636) : "The first question we shall consider is, what is the legal effect of an agreement made before marriage between a husband and wife of different relig-ious persuasions that boys should be educated in the re-ligion of the father, and girls in the religion of the mother? We are of opinion that such an agreement is not binding as a legal contract. No damages can be recovered for a breach of it in a court of law, and it cannot be enforced by a suit for specific performance in equity. We think that a father cannot bind himself con-clusively by contract to exercise, in all events, in a par-ticular way, rights which the law gives him for the bene-fit of his children, and not for his own."

So in Agar-Ellis v. Lascelles, 27 W. R. 117 (1878), Lord JAMES delivering the judgment of the court, held (l. c. 119) that on principle and authority, it is settled "so as to be beyond question or argument, that the an-te-nuptial promise is in point of law absolutely void." That promise was set out in a "treaty for marriage" af-terwards consummated, by which the man gave the woman and her friends an unconditional promise that the children born of the marriage should be brought up in the religious faith of the woman. The husband re-tracted the promise after marriage. The court held he could not be compelled to observe it.

In the case of In re Nevin, supra, a case determined in the Chancery Division of the Supreme Court of Judi-cature, Sir Nathan LINDLEY, one of the Lords Justices of the Court of Appeal, following the decision by Mr. Justice CHITTY, one of the Justices of the High Court

attached to the Chancery Division, concurred in by BOWEN and KAY, JJ., held that an ante-nuptial contract that the children of the marriage should be brought up in a particular religious faith, has been decided over and over again not to be in any legal sense a binding contract. The opinions of the several justices in this case contain very full citation of authority on this proposition, among other cases cited being that of Andrews v. Salt, supra.

In our own State a phase of this same doctrine has been distinctly announced in at least three cases. The first, In re Doyle, supra, where Judge BAKEWELL, speaking for the court (l. c. 170) says, that the father had not by the agreement there referred to wholly parted with his rights as a father and that in the opinion of the court he could not by any such agreement wholly part with those rights.

In the case In re Scarritt, supra, our Supreme Court, after quoting approvingly from Schouler on Domestic Relations as hereinbefore quoted by us, at page 584, says: "As to any mere article of property, either personal or real, the law permits a man to dispose of it, by gift or contract, as he chooses. Not so of his children. The father owes a duty to nurture, support, educate and protect his child, and the child has the right to call on him for the discharge of this duty. These obligations and rights are imposed and conferred by the laws of nature; and public policy, for the good of society, will not permit or allow the father to irrevocably divest himself of or to abandon them at his mere will or pleasure. Such, generally, is the admitted law of the case."

In Weir v. Marley, supra, at page 494, treating of the right of a father to contract away the care and education of his child, it is said that, "He cannot deprive himself of this right of custody, which is the concomitant of a personal trust imposed upon him by the law of nature, as well as by positive law, and essential to the discharge of the duties of that trust, by contract per se,

otherwise he might deprive his child and society of the benefits which the law contemplates will inure to each by the personal discharge of his parental duties." Referring to the Scarritt case, supra, the court says, at page 495, "That a father cannot by contract, other than such as are provided for by statute, confer upon another irrevocably and absolutely as against himself a right to the custody of his minor child."

Referring to that feature of the case which is so earnestly pressed upon us by plaintiff and his counsel, namely that we are to and can consider the welfare of these children when closely connected with that is their religious training, we cannot do better than quote Judge BAKEWELL in the Doyle case, supra, in which case that learned judge has said: "A great deal has been said in the argument as to the religious question. In determining what will be best for the child, we cannot, under the system of law which we are appointed to administer, look at that. The state of which we are citizens and officers, does not regard herself as having any competency in spiritual matters. She looks with equal eye upon all forms of a so-called Christianity, and subjects no one to any disability for rejecting Christianity in any form, nor for rejecting the generally accepted doctrines of natural religion. A father in Missouri forfeits no rights to the custody and control of his child by being, or becoming, an atheist, nor are his rights in this respect increased before the law by his believing rightly. The law does not profess to know what is a right belief." After referring to the section of the law forbidding the appointment as guardian of one of a different faith from that of the surviving parent, Judge BAKEWELL says (l. c. 167): "We consider that the state has thus a declared policy, which we ought to respect in a kindred case."

These observations were made in a proceeding under the Habeas Corpus Act. In a proceeding in equity, as this case at bar is, a court of equity cannot decree

Brewer v. Cary.

specific performance of a moral duty, cannot enforce a duty that is one of conscience. Nor can we, in determining what is for the welfare of the infant, determine that on considerations of religion. That would involve our determination between religions—and that we are not permitted to do.

In the light of the adjudged cases, and bound as we are to follow them, we hold, first, that original jurisdiction for the appointment and removal of a guardian, or for removal of a guardian appointed by law, or of a testamentary guardian, or for the removal of a surviving parent from the guardianship and control of an infant child, vests solely in the probate courts of the state; that the circuit courts, as courts of equity, have no original jurisdiction in such matters; that the right of custody as guardian, whether natural or by appointment of law, carries with it, as one of the incidents involved, the right as well as the duty to direct its training, its education, religious and secular, its conduct—in fact confers the right of a parent with all its incidents; that these are of the very essence of the appointment of guardians, and lie at the foundation of the right of custody itself, and that no court will interfere directly in directing such matters, save when convinced that the welfare of the child demands it. That when the question of its welfare turns on the direction of its training and upbringing in one belief or another, our courts, save as controlled by statute, have no power; that to do so would be a determination by the courts as to differences in religious belief, which is incompatible with religious freedom. On habeas corpus the circuit court, or court having jurisdiction over such proceedings, will determine when called upon to decide between different parties claiming the custody of the child, where the custody or the liberty of the child is involved, which custody will best advance and secure the welfare of the child, but will not undertake to appoint or remove a guardian. Nor can any court, as a court of equity, do so. Secondly, we

hold that this plaintiff has no standing in this court for lack of appointment under the statute as next friend of these infants. Thirdly, that the contract between the defendant and his former wife, now dead, is a contract which for the reasons hereinbefore stated is not enforceable at law or in equity. So holding, we conclude that the judgment of the circuit court in sustaining the demurrer and rendering judgment for the defendant in the case at bar, was correct. It is affirmed. *Nortoni, J.,* concurs; *Goode, J.,* not sitting.